UNITED STATES of America, Plaintiff-Appellee,

v.

Calvin Lamar BOSBY, Alan Maurice Ticey, and Charles F. Hill, Jr., Defendants-Appellants.

No. 81–7245.

United States Court of Appeals, Eleventh Circuit.

May 10, 1982.

Stewart, Falkenberry & Whatley, Joe R. Whatley, Jr., Birmingham, Ala., for Bosby.

John S. Tucker, Birmingham, Ala., for Ticey.

A. Allen Ramsey, Birmingham, Ala., for Hill.

Holly Wiseman, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before TUTTLE, KRAVITCH and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Defendants Hill, Bosby and Ticey were indicted for mail fraud, 18 U.S.C.A. § 1341,[1]

---

1. 18 U.S.C.A. § 1341 states:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

and conspiracy to commit mail fraud, 18 U.S.C.A. § 371.[2] After a nine-day trial, the defendants were convicted on all counts and sentenced to varying periods of incarceration.[3] Defendants appeal, alleging numerous errors below. We affirm.

## I.

Defendants Ticey, Hill and Bosby, along with Heard, Rudolph and Haggins, engaged in a concerted effort to defraud certain banks and stores in Birmingham, Alabama. In November 1980, Heard, Hill and Ticey, traveled from Tennessee to Birmingham. Once in Birmingham, Heard opened a checking account at the Birmingham Trust National Bank (BTNB) with a minimum deposit. He ordered personalized checks and had them sent to his father's Birmingham address. Heard represented to bank officials that the address was his and that he had resided there for five years. In reality, Heard had lived in Chicago during the previous five years. Later the same day, Heard opened another checking account, this time at the First National Bank (FNB), and again ordered personalized checks. In both instances, the personalized checks were printed and mailed.

The next day, Heard deposited a $9,500 check drawn on a Chicago bank into his account at FNB. Heard had apparently received the check from defendant Ticey. Although the check was ultimately returned uncollected, the FNB mistakenly credited Heard's account with the amount. Heard then withdrew $9,000 and gave $6,000 to Ticey. Ticey used a portion of the money to rent a room at a local motel where he later met defendant Bosby.

While in Birmingham, Heard contacted an acquaintance, Randy Rudolph, and suggested that Rudolph might want to make some money by opening checking accounts at local banks. Heard and defendants Ticey and Bosby drove Rudolph to two local banks, Metro Bank and Exchange National Bank, and waited while he opened checking accounts. Rudolph ordered personalized checks at both banks and had them sent to his home address in Birmingham. Later that evening, he deposited into his account at Metro Bank a $9,912 check drawn on Ticey's Chicago bank account. The same evening, Heard deposited into his account at BTNB an $8,800 check, drawn on a Bensonville, Illinois, bank, that he had received from Ticey. The following day, defendant Bosby opened an account at Central Bank. Employing a similar modus operandi, Bosby deposited the minimum amount and ordered personalized checks. He had the checks sent to the address of an aunt residing in Birmingham. Shortly after the account was opened, a $10,500 check drawn on defendant Hill's Chicago account was deposited into Bosby's account at Central Bank.

Heard, Rudolph and the three defendants now had accounts at five different Birmingham banks and had deposited out-of-state checks in four of the accounts. All of the checks were ultimately returned uncollected. On November 21, two weeks after Heard opened the first account, defendants Bosby and Hill attempted to cash a $10,000 check drawn on Bosby's account at Central Bank. The teller refused to honor the check due to insufficient funds in the account. The same day, Heard, accompanied by Ticey and Hill, tried to withdraw $8,500 from the BTNB account. The check was not cashed, again due to insufficient

**2.** 18 U.S.C.A. § 371 states in pertinent part:
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**3.** Defendant Hill was charged with and convicted of three counts of mail fraud and one count of conspiracy to commit mail fraud. He received two five-year sentences to be served consecutively and two five-year sentences to be served concurrently. Bosby was indicted and convicted of one count of mail fraud and one count of conspiracy. He received two five-year sentences, to be served concurrently. Ticey was indicted and convicted of three counts of mail fraud and one count of conspiracy. He received four five-year sentences, to be served concurrently.

funds. Undaunted, Heard went to a different BTNB branch and attempted to cash a $7,000 check. The attempt was unsuccessful. Finally, Jeffrey Haggins, an accomplice in the scheme, presented a $900 check drawn on Heard's BTNB account but was informed that it could not be cashed due to insufficient funds in the account.

Unable to cash the checks at the banks, Heard, Haggins and the defendants proceeded to a local jewelry store. Heard and Hill entered the store while Bosby, Ticey and Haggins waited outside in Bosby's cadillac. Heard purchased over $2,800 worth of jewelry and paid for the merchandise with a personalized check drawn on the BTNB account which he had received through the mail. A store clerk that had been sent to the bank to get the check certified discovered that the account contained insufficient funds to cover the check. Heard and Hill left the store with the jewelry just before the employee called from the bank that the check was no good. The police were notified and were provided a description of the persons in the store and the automobile. A few moments later, police located the cadillac and arrested the occupants, Bosby, Ticey and Haggins. Heard and Hill were subsequently arrested.

Following the arrest, law enforcement officials impounded the cadillac and had it towed to a garage. The next day, Detective Street of the Birmingham Police Department conducted an inventory search of the vehicle and uncovered a number of incriminating documents. Three days after the arrest, FBI agents obtained a search warrant for the cadillac and a black briefcase found in the automobile's trunk. The search uncovered various documents from Birmingham and Chicago banks. The documents were later admitted as evidence at trial.

## II.

Defendants allege that the search of the automobile and the briefcase found in the trunk of the car violated the Fourth Amendment. Law enforcement officials searched the automobile on two occasions:

once to inventory the contents and once pursuant to a warrant. Defendants claim that the inventory search was a pretext for an investigatory search and therefore illegal. Defendants support their contention by noting that the inventory search was conducted by the arresting officer, Detective Street, rather than by a lower echelon police official. Moreover, the search occurred on Detective Street's day off.

 Law enforcement officials need not obtain a warrant to conduct a routine inventory search. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Evidence found while conducting an inventory search is admissible. *United States v. Fossler*, 597 F.2d 478, 482 (5th Cir. 1978). Inventory searches must, however, "be limited to effectuation of the recognized purposes for which they are conducted and they may not be used as a pretext for intrusive investigatory searches that would otherwise be impermissible." *United States v. Prescott*, 599 F.2d 103, 105 (5th Cir. 1979).

 We are unpersuaded that Detective Street conducted the inventory search as a subterfuge for an investigatory search. The record reveals that the Birmingham police had a written policy concerning inventory searches and routinely performed them after impounding a vehicle. Furthermore, testimony indicated that there was nothing particularly unusual about a detective such as Street performing the search. Nor did Detective Street exceed the scope normally permitted for an inventory search. *See United States v. Edwards*, 577 F.2d 883 (5th Cir.) (en banc), *cert. denied*, 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978). Finally, we agree that Detective Street may well have expected to uncover admissible evidence while conducting the search. Certainly, as the officer-in-charge of the investigation, he was the individual most likely to recognize the importance of particular documents found in the automobile. Nevertheless, the mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search. *United States v. Prescott, supra*, 599 F.2d at 106.

A more difficult question concerns the search of the briefcase. Shortly after the arrest, Detective Street arrived at the scene and removed the briefcase from the trunk of defendants' automobile. He testified that the briefcase was unlocked and the latches opened.[4] He acknowledged opening the briefcase and "glancing" at the contents.[5] He also admitted taking the briefcase into his custody and keeping it overnight.[6] The briefcase was returned to the defendants' vehicle the following morning prior to the time Detective Street conducted the inventory search.

Independent of the activities by Detective Street, FBI Agent Grenier interviewed Bosby, Haggins and Ticey and, based primarily upon their statements, obtained a warrant to search the briefcase.[7] Agent Grenier testified that he was unaware that the briefcase had been opened prior to the execution of his search. Furthermore, although conversing with Detective Street on a number of occasions before conducting the search, the agent stated that he was never provided information concerning the contents of the briefcase.[8]

Defendants claim that Detective Street conducted an illegal search when he opened the briefcase and viewed the contents. They also assert that the illegal search somehow invalidated the subsequent search conducted by Agent Grenier, thereby rendering the evidence found inside inadmissible.

Fourth Amendment search and seizure law is fraught with uncertainties and difficult distinctions. Thus, we are sympathetic with the problems frequently encountered by law enforcement officials in attempting to discern the precise bounds of the law. In the instant appeal, however, we deal with an unusually clear area of the law. Absent exigent circumstances, closed containers such as a briefcase or pieces of personal luggage even if unlocked cannot be searched absent a warrant. *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (luggage); *United States v. Kreimes*, 649 F.2d 1185, 1190 (5th Cir. 1981) (luggage); *United States v. Moschetta*, 646 F.2d 955, 959 (5th Cir. 1981) (briefcase). The moment Detective Street opened the briefcase and looked inside, he conducted a search. Since the record reveals neither exigent circumstances nor the presence of a warrant, we agree with the defendants that the search by Detective Street transgressed the Fourth Amendment. The egregiousness of the search was compounded when Detective Street took it upon himself to retain unsupervised possession of the briefcase overnight. Notwithstanding the illegal search, however, we are unable to conclude that the contents of the briefcase must be suppressed.

Had any of the documents found in the briefcase been admitted at trial as a result

---

4. Detective Street gave conflicting testimony on a number of points. He originally denied opening the briefcase or removing it from the car. He asserted that the briefcase had been taken out of the trunk by "some officer at the scene of the crime." Later, Street recanted the testimony and admitted both removing the briefcase from the trunk and looking inside. Detective Street also testified that he had never seen another officer or individual handle the briefcase prior to the time he took it from the automobile.

5. The briefcase, according to testimony of an impartial witness, was closed and locked at the time of the arrests. Nevertheless, when the briefcase was searched pursuant to a warrant three days later, the lock on the briefcase had been broken. The record does not reveal with certainty the person that broke the lock on the briefcase although defendant Ticey testified

that Detective Street forced open the briefcase with a tire iron. The district court, however, determined that Ticey's testimony lacked credibility on that point.

6. We find it irregular, to say the least, that an officer would take a briefcase that might contain admissible evidence from the scene of a crime and keep it overnight.

7. In the affidavit used to obtain the search warrant, reference is made to the possibility of incriminating documents inside the briefcase. The affidavit states that the information concerning the contents was obtained from Jeffrey Haggins.

8. FBI Agent Grenier and Detective Street were both at the scene of the arrest. Furthermore, they questioned Haggins, Bosby and Ticey together at the Birmingham City jail.

of the illegal search, we would not hesitate to suppress the evidence. *See Mapp v. Ohio*, 367 U.S. 643, 660, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961) (adopting exclusionary rule and stating that "we can no longer permit [the Fourth Amendment] to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment."). The evidence was not, however, obtained from the illegal search. Instead, the evidence was seized pursuant to a valid warrant executed by FBI Agent Grenier. Thus, absent proof that the first, illegal search somehow tainted the second, legal search, the evidence was properly admissible. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Haddad*, 558 F.2d 968, 975 n.6 (9th Cir. 1977); *United States v. Galante*, 547 F.2d 733, 740 (2d Cir. 1976), *cert. denied, Cameriero v. U. S.*, 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977).

We have meticulously combed the ten volumes of record filed on appeal for any indication that Agent Grenier's search may have been tainted by the illegal search. We have found none. Agent Grenier denied having prior knowledge of either the contents of the briefcase or the fact that it had been opened. At worst, the record reveals that Agent Grenier met with Detective Street before obtaining the warrant and therefore had the opportunity to learn of the illegal search. Under the facts of this case, we do not consider such opportunity sufficient to establish a taint. *Cf. United States v. Edwards*, 443 F.Supp. 192 (D.Mass. 1977), *aff'd*, 602 F.2d 458 (1st Cir. 1979). Finally, the affidavits filed to obtain the warrant contain information obtained al-

most entirely from the defendants. Thus the factual predicate for the warrant was not based in any way on information obtained during the illegal search. Accordingly, we conclude that the evidence was seized pursuant to a validly executed warrant and therefore admissible.

### III.

■ Two of the defendants, Bosby and Hill, contend that the district court erred in failing to suppress statements made following their arrest. Both claim that the police violated the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by initiating questioning after they had invoked the right to remain silent. We find the arguments devoid of merit.[9]

Following the arrest, the arresting officers read Bosby his *Miranda* rights. The rights were repeated at the Birmingham police station. Bosby refused to sign the written waiver form and invoked his right to remain silent.[10] As a result, law enforcement officials immediately terminated the interrogation. A few weeks later, Agent Grenier approached Bosby, advised him of his *Miranda* rights and again questioned him about the fraudulent scheme. This time Bosby signed the waiver form and made incriminating statements. The statements were admitted into evidence at trial.

■ Law enforcement officials are required to apprise putative defendants of their right to counsel and right to remain silent before conducting a custodial interrogation. *Miranda v. Arizona, supra*. Although the assertion of either right mandates the immediate cessation of an interro-

---

9. The Government's discussion of this issue contains references to an affidavit attached to the brief. The affidavit was not before the district court and therefore outside the record. Generally, appellate courts will not consider matters outside the record. *Scarborough v. Kellum*, 525 F.2d 931, 933 (5th Cir. 1976). We have inherent equitable powers to permit parties to supplement the record on appeal. *Dickerson v. Alabama*, 667 F.2d 1364, 1367 (11th Cir. 1982). We did not, however, ask the Government to supplement the record, nor did

the Government file a motion to do so. Accordingly, we consider the affidavit not properly before us and disregard the contents.

10. Counsel for defendant Bosby intimated at oral argument that Bosby had invoked his right to counsel, not his right to remain silent. We have reviewed the record and find no evidence that, at the time Bosby was originally questioned, he invoked his right to counsel. Instead, the evidence shows clearly that he merely asserted his right to remain silent.

gation, the particular right invoked has a differing impact on subsequent police conduct. *United States ex rel. Riley v. Franzen*, 653 F.2d 1153, 1158 (7th Cir. 1981) ("the invocation of a defendant's right to silence may have a different impact on the permissibility of subsequent police conduct than the invocation of his right to counsel."). Upon assertion of his right to counsel, law enforcement officials cannot subject the defendant to further questioning until an attorney has been appointed for him and he has been accorded the opportunity to consult. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378, 386 (1981); *see United States v. Little*, 647 F.2d 533, 534 (5th Cir. 1981). Thus a request for counsel acts as an absolute prohibition on the right of police to initiate questioning until an attorney has been appointed.[11] No such proscription upon the right of police to resume questioning exists where a defendant asserts his right to remain silent. Instead, law enforcement officials are required to cease questioning the defendant but may resume the interrogation at some later time. *Michigan v. Mosely*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *accord, United States v. Pulvano*, 629 F.2d 1151, 1157 (5th Cir. 1980).

▮▮▮▮ The moment Bosby invoked his right to remain silent at the initial interrogation, the questioning ended. Agent Grenier waited a reasonable time—over two weeks—before again questioning the defendant.[12] At the second session, Bosby was again informed of his *Miranda* rights. He executed a written waiver and voluntarily gave the agent incriminating evidence. The procedure employed by Agent Grenier fully comported with defendant's *Miranda* rights. The district court, therefore, correctly refused to suppress the evidence.[13]

## IV.

Defendants next assert that the Government failed to establish the necessary ele-

11. *Edwards* does not, however, stand for the broad proposition that every statement made by a defendant after invoking his right to counsel will always be inadmissible. For example, where a defendant initiates the conversation that leads to incriminating statements, the statements are admissible. *Edwards v. Arizona, supra*, 451 U.S. at 483, 101 S.Ct. at 1884, 68 L.Ed.2d at 387. *Accord, United States v. Webb*, 633 F.2d 1140, 1142 (5th Cir. 1981); *Foster v. Strickland*, 517 F.Supp. 597, 606 (S.D. Fla.1981). *Edwards* merely prohibits law enforcement officials from initiating an interrogation prior to the time defendant receives an attorney.

12. The Supreme Court in *Michigan v. Mosely, supra*, did not specify the length of time that law enforcement officials must wait before resumption of questioning. The Court held, however, that two hours between interrogations constituted a reasonable time. *See also Shaffer v. Clusen*, 518 F.Supp. 963, 965 (E.D.Wis. 1981) (nine minutes between interrogations not reasonable). Thus the two week delay in the resumption of questioning by Agent Grenier clearly constituted a reasonable time between interrogations.

13. Defendant Hill's claim that his *Miranda* rights were violated when law enforcement officials questioned him after he invoked his right to remain silent not only lacks merit but misrepresents the facts. FBI Agent Neal effectuated the arrest of Hill. At the time of the arrest, *Miranda* rights were read to the defendant. Agent Neal repeated the rights shortly after having Hill fingerprinted and photographed. Defendant Hill refused to sign the written waiver form but acknowledged that he understood his rights. After some small talk, Agent Neal asked Hill about his activities in Birmingham. Hill talked for five or ten minutes before invoking his right to counsel. After he requested an attorney, the interrogation ceased. The statements made by Hill before invoking his right to counsel were admitted at trial.

Contrary to statements in defendant Hill's brief, Hill at no time asserted his right to remain silent. Furthermore, he did not ask for an attorney until after making incriminating statements. Once a defendant is informed of his rights, he has the burden of indicating in some manner that he wishes to remain silent. *United States v. Rice*, 652 F.2d 521, 527 (5th Cir. 1981). Moreover, even if he invokes his right, he will "not render answers tendered before the privilege was invoked involuntary." *Id.* The failure of Hill to affirmatively invoke his right to remain silent constituted a waiver. Nor does the failure to sign the written waiver form demonstrate that the waiver was involuntary. *United States v. Klein*, 592 F.2d 909, 914 (5th Cir. 1979); *United States v. Stewart*, 585 F.2d 799, 800 (5th Cir.), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1978). Accordingly, the statements made by defendant Hill after his arrest but before he requested counsel were properly admitted at trial.

ments of mail fraud. They contend that the evidence does not show that the mails were used to further the fraudulent scheme.

■ Mail fraud requires proof of two elements: (1) a scheme to defraud and (2) use of the mails "for the purposes of executing" the fraudulent scheme. 18 U.S.C.A. § 1341; *United States v. Bethea*, 672 F.2d 407, 410 (5th Cir. 1982). The Government need not establish, however, that "but for" the mailing, the fraudulent scheme would not have succeeded. *United States v. Rodgers*, 624 F.2d 1303, 1309 (5th Cir. 1980), *cert. denied, Anthony J. Bertucci Construction Co., Inc. v. U. S.*, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); *United States v. Kent*, 608 F.2d 542, 546 (5th Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). Instead, the proof must show that the use of the United States mail played an "integral" rather than incidental or tangential role in the fraudulent scheme. *United States v. Bethea, supra; United States v. Kent, supra*, 608 F.2d at 546.

■ In order for the fraudulent scheme to succeed, defendants had to enshroud the new bank accounts with an aura of legitimacy.[14] Bank officials testified that new customers typically order personalized checks and have them mailed to their local address. Thus, to avoid suspicion, defendants also ordered personalized checks and had them mailed to a local Birmingham address. Furthermore, testimony in the record indicates that local merchants would not accept a non-personalized check.[15] Thus obtaining the checks was essential to the defendants' scheme to defraud both the banks and local merchants. Accordingly, we conclude that the use of the mails to have the personalized checks sent to a local address was an integral part of the fraudulent scheme.[16]

■ Defendant Bosby contends that there was no evidence that he used the mails to further the fraudulent scheme. Bosby opened an account at Central Bank and had personalized checks sent to defendant Hill's aunt in Birmingham. The aunt testified that she did not know Bosby and returned the checks to the bank. Bosby asserts that the lack of knowledge by the aunt somehow demonstrates that he did not use the mails to further the scheme. We

---

14. For example, one bank official testified that she was "suspicious" of Randy Rudolph when he entered the bank. As a result, she refused to issue him a starter checkbook. Further, she testified that she intended to "watch the account." Finally, Rudolph was secretly photographed. All of these precautions were part of the bank's security procedures. The testimony indicates that had the defendants appeared "suspicious" at the time the accounts were opened, bank officials would have placed the accounts into a "heightened scrutiny" category. Thus it was extremely important that the defendants not do anything out of the ordinary that might attract unusual attention to the accounts.

15. Employees at the jewelry store that was defrauded by the defendants stated that the store's policy was to accept only personalized checks. They also stated that they would not accept out-of-state checks. The record shows that Heard purchased the jewelry with a personalized check drawn on the BTNB.

16. During trial, Bosby's attorney sought to show that bank officials did not "care" whether a new customer obtained personalized checks from the bank or had them sent through the mail. The district court sustained the Government's objection to the testimony. Bosby contends that the ruling deprived him of the opportunity to show that bank officials were not "lulled" by the mailing of the personalized checks into believing that the accounts were legitimate.

At best, the testimony sought by Bosby would have established that defendants could have provided the new accounts with an appearance of legitimacy by either obtaining the checks at the bank or receiving them in the mail. Such testimony merely establishes that the use of the mails was not *essential* to the scheme to defraud. The Government need not, however, prove that the use of the mails was *essential* to the success of the fraudulent scheme in order to establish a violation of Section 1341. *United States v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974); *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Instead, the use of the mails must simply contribute in some consequential manner to the success of the scheme. Thus the testimony that bank officials did not "care" if checks were obtained at the bank rather than mailed was correctly excluded as immaterial.

find the contention meritless. As previously noted, the use of the mails occurred when defendants caused personalized checks to be sent to local Birmingham addresses in order to provide the new accounts an appearance of legitimacy. This appearance of legitimacy did not in any way depend upon the knowledge of the recipient of the checks. Thus the fact that the aunt did not know Bosby is irrelevant to whether he used the mails to further the scheme.[17]

## V.

Defendants have purported to find error in the *voir dire.* The defendants requested that the court ask each prospective juror:

(a) What magazines and newspapers do you subscribe to?

(b) What is the most recent book that you have read?

(c) Describe your educational background.

The trial judge, however, rejected the questions. Defendants insist that the questions were relevant and would have provided useful information in light of the "sophisticated" nature of the factual questions at issue.

■ Trial judges are accorded broad discretion in determining the scope of *voir dire.* Fed.R.Crim.P. 24(a); *United States v. Colacurcio,* 659 F.2d 684, 689 (5th Cir. 1981). Their discretionary authority includes the right to reject questions submitted by coun-

sel. *United States v. Brooks,* 670 F.2d 148, 151 (11th Cir. 1982); *United States v. Magana-Arevalo,* 639 F.2d 226, 228 (5th Cir. 1981). The court need only inquire into those areas suggested by counsel that are calculated to elicit information necessary to make an informed decision concerning the acceptance of or the dismissal of a juror. *United States v. Garza,* 574 F.2d 298, 303 (5th Cir. 1978); *see also Rosales-Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981).

■ We are unable to say that the district court abused its discretion by refusing to ask the requested questions. None of the questions would have revealed bias or prejudice by jurors that might necessitate dismissal. Thus we find no compelling reason why the trial judge should have asked the requested inquiries.

## VI.

Finally, we consider errors raised by individual defendants. Hill contends that he was prejudiced by certain questions asked on direct examination and is therefore entitled to a new trial. During the trial, Rudolph and Heard, both participants in the fraudulent scheme, testified on behalf of the Government. The prosecuting attorney asked Rudolph a number of questions concerning defendant Hill's involvement in the scheme. The witness essentially denied having any knowledge that Hill partici-

---

**17.** In a somewhat related issue, Bosby alleges that the district court erred by refusing to inform the jury in a supplemental charge that the fraudulent scheme must *depend* upon the use of the mails. *See United States v. LaFerriere,* 546 F.2d 182, 187 (5th Cir. 1977).

In reviewing the jury charge, we need only ascertain whether, when viewed as a whole, the charge fairly and correctly states the issues and law. *United States v. Pool,* 660 F.2d 547, 558 (5th Cir. 1981). Furthermore, so long as the charge correctly recites the law and issues, the trial judge may employ whatever words and phrases he desires. *United States v. Ruppel,* 666 F.2d 261, 273 (5th Cir. 1982). The supplemental charges correctly state the issues and the law. The court informed the jury that an essential element of mail fraud was proof that the defendants "used the United States Postal Service by mailing or by causing to be mailed some matter or thing for the purpose of

executing a scheme to defraud." He cautioned the jury that the use of the mails must be more than incidental to the scheme but that the Government need not establish that "but for" the mailing the scheme would not have succeeded. The language constitutes an almost verbatim rendition of language used in prior cases. *See, e.g., United States v. Rogers, supra; United States v. Kent, supra.*

Finally, we note that the charge requested by the defendants, although perhaps a correct statement of the law, may have given the mistaken impression that use of the mails was essential to the success of the fraudulent scheme. As we have previously noted, the Government need not establish that the mailing was essential to the scheme's success in order to establish a violation of Section 1341. *See* note 16, *supra.* Accordingly, we conclude that the district court did not err in charging the jury.

pated in the scheme. The prosecuting attorney also asked Heard questions relating to the payment of Hill's attorney's fees. Heard admitted paying the fees. Hill asserts that, prior to the testimony from Rudolph and Heard, the Government had an extremely weak case,[18] and that by asking the questions, the prosecuting attorney gave the mistaken impression that Hill was a major participant in the scheme.

In reviewing allegedly improper inquiries by the Government, we must assess the impact of the questions in the context of the entire trial. *United States v. Davis*, 546 F.2d 583, 593 (5th Cir.), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). Nothing in the record indicates that the questions were asked in an attempt to intentionally mislead the jury. *See United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir. 1981). In fact, the questions, particularly those addressed to Rudolph, appear to be nothing more than good faith attempts to determine the scope of Hill's involvement in the fraudulent scheme.[19] Furthermore, any harm that might have been caused by the questions was obviated by the negative responses given by the witnesses. *See United States v. Roe*, 670 F.2d 956, 968 (11th Cir. 1982). Thus we are unable to conclude that the questions were either prejudicial or asked in bad faith.

Defendant Ticey asserts that the trial judge erred by failing to mention use of the mails in the charge relating to conspiracy to commit mail fraud. Significantly, defendant cites no authority for the argument. We have thoroughly reviewed the entire charge and conclude that, read as a whole, the charge constitutes an accurate statement of the law and issues. *See United States v. Pool, supra,* 660 F.2d 547. Accordingly, the argument is without merit.

18. In fact, prior to the questioning, the trial judge specifically noted that he was "troubled about whether or not there has been substantial, independent evidence of a conspiracy on the participation in the conspiracy on the part of the Defendant Hill."

19. On at least one occasion, the prosecutor expressed surprise at the answer given by Rudolph. Further, the trial judge noted for the

For the reasons stated herein, the defendants' convictions are AFFIRMED.

record that Rudolph was hostile and evasive. The trial judge even went so far as to remind the witness that he was under oath and could be prosecuted for perjury. In light of the recalcitrant nature of the witness, the prosecutor's questions relating to defendant Hill can only be viewed as a good faith attempt to discern exactly what Rudolph knew about Hill's involvement in the fraudulent scheme.