**Herman J. CREASY, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Respondent Below).**

**No. 2-1083 A 388.**

Court of Appeals of Indiana, Second District.

Dec. 27, 1984.

Susan K. Carpenter, Public Defender, William L. Touchette, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Judge, dissenting.

I respectfully dissent. The statement given by Creasy during custodial interrogation was erroneously admitted into evidence.[1]

Had the record of the suppression hearing been before us as a part of the direct appeal, it is my view that we would have been compelled to reverse the conviction and grant a new trial. Accordingly, I must conclude that absence of that portion of the record in the direct appeal entitles the petitioner to post-conviction relief.

In the direct appeal we held that because the only evidence before us was the testimony of the interrogating officer to the effect that Creasy signed a waiver form and voluntarily answered the questions propounded, the trial court did not err in admitting the inculpatory statement.

The inculpatory statement made by Creasy and admitted over objection was made after a colloquy during custodial interrogation. At the time of the direct appeal we did not have the benefit of that portion of the record. Insofar as pertinent it was as follows:

"Q: Okay. Mr. Creasy, I'm going to advise you of your rights. Any parts of the rights that you shouldn't understand, and if you don't understand, feel free to ask for an interpretation. Alright?

A: Yes sir.

Q: OK, I'm reading from the advice of rights form used by this department. It says, before we ask you any questions, you must understand your rights. You have the right to remain silent. You understand that?

A: Yes sir.

Q: Anything you say can and will be used against you in court. You understand that?

A: Yes sir.

Q: You cannot afford a lawyer, one will be appointed by court for you. Do you understand that?

A: Yes sir.

Q: If you decide to answer questions now without a lawyer present you will still have the right to stop answering at anytime. You also have the right to stop answering at anytime until you've talked to a lawyer. Do you understand your rights?

A: Yes sir.

Q: Okay, I'll hand you the form. You'll notice it says waiver of rights. Would you read that line under that capped section?

A: I have read this statement of my rights and I understand what my rights are.

Q: Is that true?

A: Yes sir.

Q: Would you place your signature on that line acknowledging that you have been advised of your rights and that you understand your rights?

A: Yes sir.

Q: Now, would you read the next paragraph?

A: I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Q: Do you understand the word coercion?

A: Yes sir.

Q: What's it mean to you?

A: It means that you haven't done anything to make me make a statement.

Q: Okay. Okay, do you agree with that paragraph?

---

1. There is no doubt that the statement was extracted in the coercive atmosphere of a custodial interrogation. *See Oregon v. Mathiason* (1977) 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714.

A: What do you mean do I agree?

Q: Do you want to go ahead and talk with us?

A: *No sir."* (Emphasis .supplied) Record at 157–158.

And at the post-conviction hearing the interrogating officer confirmed that interrogation as follows:

"Q And did you attempt to take a statement from him at the jail?

A After we arrived and processed him at the jail.

Q And were you present when his rights were read?

A I read his rights to him.

Q You were present during the taking of his statement?

A I was.

Q And do you recall if you asked him a question, "Do you want to go ahead and talk with us? And the defendant replying, 'No, sir.'?"

A I recall that.

Q You do recall him saying that?

A Right.

Q And did you proceed—after that, in questioning the defendant?

A Yes, going all the way that we could tell him anything about what we developed, any information, was to complete the—the advice of rights form and waiver, keeping in mind that at any time he felt like he was incriminating himself—discontinue the interview.

Q Did he have an attorney present?

A Not at that time.

Q *But he did say he did not want to speak with you?*

A *Yeah.*

Q *And it was thereafter that a statement was given?*

A *Right.*

Q Okay." (Emphasis supplied) Record at 389–390.

Creasy told the interrogating officer, quite specifically, that he did not wish to talk with them further. It was only after this and after further questions by the officer concerning the nature of the charges against him that Creasy "agreed" to answer some questions.

The law clearly and unmistakably required the police to terminate the interrogation at the time that Creasy stated that he did not wish to talk with them further. It was stated as follows in *Michigan v. Mosley* (1975) 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313:

"A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means … to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored ….' 384 U.S., at 479, 86 S.Ct., at 1630. The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' *Id.*, at 474, 86 S.Ct., at 1627. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" 96 S.Ct. 321, 326.

It is recognized that the situation before us does not involve an assertion of the right to counsel precluding all further questioning until counsel has been consulted. *See Smith v. Illinois,* —— U.S. ——, 105 S.Ct. 490, 83 L.Ed.2d —— (1984), and *Solem v. Stumes* (1984) —— U.S. ——, 104 S.Ct. 1338, 79 L.Ed.2d 579. Rather, we concern ourselves with the requirement that law enforcement officials cease questioning when a defendant asserts his right to remain silent and may resume questioning only at a later time pursuant to *Michigan v. Mosley, supra,* 423 U.S. 96, 96 S.Ct. 321. *United States v. Bosby* (11th Cir.1982) 675 F.2d 1174 at 1181–1182.

Our case is to be distinguished from *Lee v. State* (1981) Ind., 424 N.E.2d 1011, in which the evidence supported the trial court's determination that the incriminating statements were made before the defendant expressed a wish to terminate the discussion.

In the case before us, after Creasy indicated his desire to terminate the interrogation, the continuation of the conversation by initiation of the investigating officers in a setting likely to elicit incriminating responses was improper and should result in reversal of the conviction. *Rhode Island v. Innis* (1980) 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297.

Although the *Innis* decision involves a statement made after assertion of the right to counsel, its treatment of the coercive or suggestive aspects of an interrogation atmosphere is particularly salient. Justice Stewart, speaking for the majority, said:

> "The Court in *Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.' *Id.*, at 450, 86 S.Ct., at 1615. It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation.
>
> \*    \*    \*    \*    \*    \*

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." 100 S.Ct. at 1689–1690.

*Cf. Oregon v. Bradshaw* (1983) 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (after assertion of the right to counsel, defendant himself initiated the conversation which culminated in an admissible incriminating statement.)

That the United States Supreme Court has not materially retreated from the underlying rationale of *Michigan v. Mosley*, *supra*, 423 U.S. 96, 96 S.Ct. 321, is also apparent from *Fare v. Michael C.* (1979) 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197. In a 5–4 decision, the Court held that a juvenile's request to talk with his probation officer was not equivalent to a request to talk with his probation officer was not equivalent to a request to consult with an attorney nor, in that case, had the juvenile asserted his right to remain silent. The majority held a statement made during the custodial interrogation was, therefore, admissible. However, the Court clearly stated the law from *Miranda* to have continuing viability:

> "The rule the Court established in *Miranda* is clear. In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation. 384 U.S., at 473, 86 S.Ct., at 1627. 'Once [such] warnings have been given, the subsequent procedure is clear.' *Ibid.*
>
> > 'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise....'

Any statements obtained during custodial interrogation conducted in violation of these rules may not be admitted against the accused, at least during the State's case in chief." 99 S.Ct. at 2568.

Creasy's assertion of his right to remain silent was clear and unequivocal. In *Smith v. Illinois, supra,* the United States Supreme Court so recently as December 10, 1984, reaffirmed the strong protections afforded an arrestee under the coercive circumstances inherent in custodial interrogation. In this most recent pronouncement our highest Court considered a statement made after a request to consult with counsel which request was held by the State appellate courts to have been ambiguous. The Supreme Court stated:

"The courts below were able to construe Smith's request for counsel as 'ambiguous' only by looking to Smith's subsequent responses to continued police questioning and by concluding that, 'considered in total,' Smith's 'statements' were equivocal." [Citation omitted] This line of analysis is unprecedented and untenable. (105 S.Ct. at 494)

The narrow holding of the decision was that "under the clear logical force of settled precedent, an accused's post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." (105 S.Ct. at 495)

Even the three dissenters in *Smith v. Illinois, supra,* acknowledged that "a crystal clear statement could not be rendered ambiguous by subsequent responses to questions seeking clarification." (105 S.Ct. at 496)

In light of the majority's holding here, that admission of the statement was, at worst, harmless error, I must address that issue.

I am unable to agree that the statement did not prejudice Creasy. The statement quite clearly indicated that Creasy had told conflicting stories concerning his whereabouts at the approximate time of the crime.

The damaging effect of such statements was acknowledged by the U.S. Supreme Court in *Rhode Island v. Innis, supra,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297:

"By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial. As the Court observed in *Miranda:*

'No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'. If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statements given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.' 384 U.S., at 476–477, 86 S.Ct., at 1629." 100 S.Ct. at 1690.

I do not believe that it is possible, in the light of the less than overwhelming nature of the evidence concerning his identification as the robber, and in light of the other considerations surrounding his trial representation and his relationship with the investigating police officer, for us to state that the custodial statement did not beyond a reasonable doubt contribute to the jury's determination.

I would reverse the judgment denying post-conviction relief and would remand the cause with instructions to set aside the judgment of conviction.