789 So.2d 941 (2001)
Ex parte Frederick D. WOODS.
(Re Frederick D. Woods v. State).
1990867.
Supreme Court of Alabama.
January 12, 2001.
*942 Bryan A. Stevenson and Cathleen I. Price, Equal Justice Initiative of Alabama, Montgomery, for petitioner.
Bill Pryor, atty. gen., and Michelle Riley Stephens, asst. atty. gen., for respondent.

On Application for Rehearing
HOOPER, Chief Justice.
The opinion of August 4, 2000, is withdrawn and the following is substituted therefor.
Frederick D. Woods was convicted of murder made capital because it was committed during the course of a robbery. Ala.Code 1975, § 13A-5-40(a)(2). The jury, by a vote of 10-2, recommended that Woods be sentenced to death. The trial court accepted the jury's recommendation and sentenced Woods to death by electrocution. The Court of Criminal Appeals affirmed his conviction and the sentence of death. Woods v. State, 789 So.2d 896 (Ala. Crim.App.1999). We granted Woods's petition for certiorari review.
In his petition, Woods raises 36 issues for review. We have carefully considered the briefs of the parties and the oral arguments of counsel and have reviewed the record. We find no reversible error. Consequently, we affirm the judgment of the Court of Criminal Appeals.[1] *943 However, we will address one of Woods's arguments, in order to explain why we, like the Court of Criminal Appeals, find no reversible error in regard to that issue.
The evidence at trial tended to show the following. On September 10, 1996, Woods, Richard Forman,[2] and Louis Jones were driving around in Jones's Ford LTD automobile and drinking wine. Woods was smoking crack cocaine. Woods asked to borrow Jones's car so that he could go to a convenience store to buy some antacid for his girlfriend. Woods and Forman left, with Woods driving Jones's car. Woods and Forman went to the Rainbow Food Mart store in Ashville, and both entered the store, where their actions were captured on a surveillance videotape. Woods and Forman both left the store, and then Forman went back in and purchased two pairs of gloves. They left the store around 9:30 p.m. and went to the Mountain Top beverage store. Woods entered the store, while Forman waited outside the door. Woods asked for transmission fluid. The owner of the store, Rush "Doc" Smith, went to the back of the store and returned with the transmission fluid. Woods then shot Smith in the head, killing him. Woods went around the counter and took *944 money out of the cash register. Forman went into the store and took liquor. Woods and Forman left the store, and they threw the gloves out on the way back to Jones's house. Jones testified that Forman appeared sad and that Jones asked Woods if he (Woods) had shot a man with Jones's gun, and that Woods answered "Yes."
Jones gave a statement to officers of the St. Clair County Sheriff's Department and took the officers to retrieve the gun, which Jones had stored at his father's house in Attalla. On September 13, 1996, Woods was taken into police custody. The next day, Woods gave the officers a statement in which he confessed to robbing and murdering Smith. He told the officers what he had been wearing at the time of the murder. Woods's clothes were retrieved from his mother's house, and DNA testing showed blood on Woods's shirt that matched the profile of the victim's blood. Expert testimony at trial indicated that Smith's DNA profile would occur in approximately one out of every 776 million white persons and one out of every 17.6 million black persons. Woods also gave the officers a breakdown of how he and Forman divided the money they had stolen and directed the police to the location of the two pairs of gloves that he and Forman had thrown out on the night of the murder. Both pairs of gloves were recovered.
At oral argument, Woods argued that the trial court should have suppressed his statements to the law-enforcement personnel. On September 13, 1996, Woods was taken into custody by the St. Clair County Sheriff's Department. He was read his Miranda rights by Deputy Thomas Dixon. Dixon testified at the suppression hearing that both he and Investigator Joe Sweatt talked with Woods on that day. Woods completed a standardized Miranda form, indicating on that form that he did not wish to make any statements. It is undisputed that all questioning ceased at that time.
Dixon testified that the next day he received a telephone call from a jailer at the jail where Woods was incarcerated. The jailer told Dixon that Woods wanted to talk to him and Sweatt. Dixon said that Woods was again read his Miranda rights and that he signed a waiver-of-rights form indicating that he understood those rights. Woods initially checked the "no" box on the waiver-of-rights form to indicate he did not wish to make a statement. Dixon testified:
"Mr. Sweatt said `Mr. Woods, if you want to talk to us, you checked the improper box. You checked no.' [Woods] stated, `I do want to talk to you. I checked the wrong box.' Investigator Sweatt advised him that he would have to initial through that and check the proper box if he did want to talk to us, which would be the box stating `Yes, I do want to talk to you.'"
Woods scratched out the mark in the "no" box, and put his initials over that box. Woods then handwrote a three-page confession and signed it. Woods also wrote out an explanation of how the money was divided between him and Forman.
Woods argues that his statements were obtained in violation of his Fifth Amendment right to remain silent, a right he says he invoked in writing at the first interrogation and reinvoked in writing at the start of the second interrogation. Woods contends that the first constitutional violation occurred when the officers interrogated him on September 14, after he had invoked his Fifth Amendment right on September 13. He argues that it is disputed whether he initiated the interrogation on September 14 because the only evidence indicating *945 that he requested to talk to the officers was Dixon's testimony.
The Court of Criminal Appeals properly determined that the State was not required to prove that Woods had reinitiated contact with the police once he invoked his right to remain silent. It has never been the law that once a suspect invokes his right to remain silent the police may never question him again unless he reinitiates contact with the police. See Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). This is true even where, as here, the law-enforcement officers sought to reinterview the suspect about the same crime. See United States v. Bosby, 675 F.2d 1174, 1182-83 (11th Cir.1982). All that is required is that the police "scrupulously honor[]" the suspect's right to remain silent and wait a reasonable time before they attempt to reinterview him or her. Mosley, 423 U.S. at 104, 96 S.Ct. 321. See also Bosby, 675 F.2d at 1182, n. 12.
When Woods initially invoked his right to remain silent, the officers immediately ceased their questioning. They did not question Woods again until the next day, and they did so then under the belief that Woods had summoned them to the jail. Even if Woods had not reinitiated contact with the officers, the lapse of one day would have been a reasonable passage of time for the officers to attempt to reinterview Woods. Therefore, Woods's first claim, that his Fifth Amendment rights were violated, is without merit. The Mosley Court noted:
"This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased their interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings...."
423 U.S. at 105-06, 96 S.Ct. 321.
Woods argues that a second constitutional violation occurred when the officers continued to interrogate him on September 14, after, he says, he had reinvoked his right to remain silent by checking the "no" box on the waiver-of-rights form and thereby indicated that he did not want to talk. Woods argues that Sweatt was required to immediately cease interrogation when Woods checked the "no" box. Instead, Woods argues, Sweatt continued to interrogate him, in violation of his Fifth Amendment rights, by asking if he wanted to make a statement. He contends that his checking the "no" box was an unequivocal indication that he was invoking his right to remain silent and that the officers could not even inquire into whether Woods had checked the correct box. Woods argues that the officers' inquiry was a form of coercion and forced him to say "no" for yet a third time. The Court of Criminal Appeals did not address this claim in its opinion.
As a corollary to this argument, Woods contends that Dixon's testimony that a jailer telephoned and told Dixon that Woods had requested to speak with the deputies constituted hearsay and that the court improperly relied upon it in the suppression hearing. The jailer who allegedly telephoned to inform Dixon that Woods wanted to talk did not testify. Woods did not object to the introduction of the alleged hearsay statements during the hearing on the motion to suppress; therefore, this Court may review the claim only by the plain-error standard.
*946 The United States Supreme Court, in United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), rejected the argument Woods now makes. That Court stated: "[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." 415 U.S. at 172-73, 94 S.Ct. 988. Furthermore, Woods conceded during oral argument that the trial court is permitted to rely on hearsay evidence during a hearing to determine the admissibility of inculpatory statements. However, he contends that the hearsay statements were not sufficient evidence to meet the State's heavy burden of proving that Woods's right to remain silent was scrupulously honored. We disagree.
Dixon's testimony that he and Sweatt were summoned to the jail by Woods was evidence of the deputies' state of mind during the second interrogation. That testimony was not hearsay because, as relevant to this claim, it was not necessary to prove the truth of the matter asserted. Instead, the statement that Woods had summoned the deputies to talk to them was relevant to the inquiry whether Woods's checking the "no" box on the waiver-of-rights form constituted an ambiguous invocation of his right to remain silent.
"When a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of clarifying the equivocal request. Martin v. Wainwright, 770 F.2d 918 (11th cir.1985), modified on other ground, 781 F.2d 185, cert. denied, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986); Thompson v. Wainwright, 601 F.2d 768 (5th Cir. 1979); Stewart v. State, 562 So.2d 1365 (Ala.Cr.App.1989); Bush v. State, 523 So.2d 538 (Ala.Cr.App.1988)."
Beard v. State, 612 So.2d 1335, 1341 (Ala. Crim.App.1992). We conclude that Woods's written assertion, on September 14, that he did not wish to speak to investigators was ambiguous, in light of the fact that the deputies believed Woods had asked a jailer to summon them to the jail. Therefore, Sweatt's subsequent question was a proper attempt to clarify Woods's ambiguous response and not an unlawful interrogation made after Woods had invoked his right to remain silent.
This Court has previously stated the standard for reviewing a trial court's determination regarding the admissibility of an inculpatory statement:
"For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App. 1984)."
McLeod v. State, 718 So.2d 727, 729 (Ala. 1998). The trial court determined, based on the evidence presented, that Woods voluntarily gave the statements, which he wrote by hand and signed. The trial court further found that Woods gave the statements with knowledge of his rights and that Woods is able to read, write, and understand words. Additionally, the trial court noted in its order that "the officers in preserving the original [form] exercised a high degree of professionalism.... They could have easily torn up the form. If their purpose was to hide or cover up or do something dishonest, they could certainly have thrown away this form and done another. Instead the defendant's *947 own initials appear over the check mark `no.'"
We cannot say that the trial court's findings are contrary to the great weight of the evidence or are manifestly wrong. Therefore, we conclude that the trial court properly admitted into evidence Woods's statements to the employees of the sheriff's department.
OPINION OF AUGUST 4, 2000, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED; AFFIRMED.
MADDOX, HOUSTON, COOK, SEE, BROWN, and ENGLAND, JJ., concur.
LYONS and JOHNSTONE, JJ., concur in the result.
JOHNSTONE, Justice (concurring in the result only).
I respectfully concur only in the result because I disagree with the main opinion in its analysis of the admissibility and effect of "Dixon's testimony that a jailer telephoned and told Dixon that Woods had requested to speak with the deputies." 789 So.2d at 945. This testimony did not have the effect of injecting ambiguity into Woods's statement on the "waiver-of-rights form." Woods's statement that he did not want to speak to the deputies was complete and unambiguous in the context of the written instrument where it appeared. Dixon's unilateral misapprehension to the contrary cannot legally contradict or vary the complete and unambiguous terms of the written instrument. See Kant v. Atlanta, B. & Atl. R.R., 189 Ala. 48, 50, 66 So. 598, 599 (1914) ("A mistake or misunderstanding of one party to a transaction, sometimes styled a `unilateral mistake,' will not [authorize] the reformation of a written instrument; since, in order to reform a contract, it must appear that the parties mutually intended something different from that expressed."). Legal evidence, not hearsay, would be necessary to prove that Woods did, in true fact, summon the deputies and did thereby create Dixon's belief and a consequent ambiguity outside the text of the instrument.
I further respectfully disagree with the main opinion on the related subject of its statement "that the trial court is permitted to rely on hearsay evidence during a hearing to determine the admissibility of inculpatory statements." 789 So.2d at 946. In this regard I agree only that our rules of evidence define certain specified circumstances which may justify a witness's testifying to the out-of-court declaration of another. One is that the out-of-court declaration affects the witness's own state of mind in a way that is relevant to an issue in the case. Rule 801(c), Ala. R. Evid. ("`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). See Charles W. Gamble, McElroy's Alabama Evidence § 242.01(1)(c)(4) p. 1113 and § 273.02 p. 1354 (5th ed. 1996) ("[A] statement constitutes nonhearsay when, as under the present theory, it is offered to prove the state of mind of the hearer.").
Dixon's testimony about the out-of-court declaration of the jailer is admissible and significant, not because the testimony injects ambiguity into the instrument, but because the testimony, irrespective of the truth or falsity of the jailer's declaration, did tend to prove Dixon's motive for resuming the efforts to interview Woods. This motive is relevant to the ultimate issue of whether the deputies overbore Woods's will to obtain his confession, in that an innocent motive of believing that Woods had summoned the deputies would tend to disprove any contention that they *948 intended and thereby effectuated an effort to overbear Woods's will.
NOTES
[1] We do express this caveat. The opinion of the Court of Criminal Appeals states:

"Woods last urges us to find that the cumulative effect of the alleged improper arguments amounted to reversible error. We have held that when no one instance amounts to reversible error, the cumulative effect can be no greater."
789 So.2d 938. A correct statement of the law would be that, when no one instance amounts to error at all (as distinguished from error not sufficiently prejudicial to be reversible), the cumulative effect cannot warrant reversal. In other words, multiple nonerrors obviously do not require reversal. The particular wording of the statement quoted here implies that multiple rulings that are, indeed, errors cannot cumulatively cause enough prejudice to require reversal unless at least one of the erroneous rulings is, in and of itself, sufficiently prejudicial to require reversal under Rule 45, Ala.R.App.P. The correct rule is that, while, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have "probably injuriously affected substantial rights of the parties," then the cumulative effect of the errors may require reversal. See Rule 45, Ala.R.App.P.; see also Ex parte Tomlin, 540 So.2d 668, 672 (Ala. 1988) ("We need not decide whether either of the two errors, standing alone, would require a reversal; we hold that the cumulative effect of the errors probably adversely affected the substantial rights of the defendant and seriously affected the fairness and integrity of the judicial proceedings. See Blue v. State, 246 Ala. 73, 80, 19 So.2d 11, 16-17 (1944); Jetton v. State, 435 So.2d 167 (Ala.Crim.App. 1983)."); McGriff v. State, [Ms. 97-0179, September 29, 2000] ___ So.2d ___, ___ (Ala. Crim.App.2000) ("Because we find no error in the specific instances alleged by the appellant, we find no cumulative error." (Quoting earlier cases; emphasis added.)); United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir.1990) ("A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."); and United States v. Canales, 744 F.2d 413, 430 (5th Cir.1984) ("We recognize that the cumulative effect of several incidents of improper argument or misconduct may require reversal, even though no single one of the incidents, considered alone, would warrant such a result.").
[2] The opinion of the Court of Criminal Appeals under review here spells that codefendant's name "Richard Fore man." Other cases involving that codefendant have spelled his last name "Forman ."

Richard Forman was also indicted and convicted for the capital murder. He was sentenced to life in prison without the possibility of parole. His conviction and sentence were affirmed on September 24, 1999, by the Court of Criminal Appeals, by an unpublished memorandum. Forman v. State (No. CR-98-0857), 778 So.2d 873 (Ala.Crim.App.1999) (table). Forman petitioned this Court for a writ of certiorari; this Court denied his petition on February 11, 2000, without an opinion. Ex parte Forman (No. 1990397), 786 So.2d 1158 (Ala.2000) (table).