[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 783 
The appellant, Ralph Pete Jackson, Jr., was convicted of the unlawful possession of cocaine and was sentenced to ten years' imprisonment. Three issues are raised in this appeal.
 I
The cocaine which the appellant was charged with possessing was found during the execution of a search warrant at a private residence. The appellant contends that this cocaine should have been suppressed because the officers conducting the search failed to comply with the "knock and announce" statute, Ala. Code 1975, § 15-5-9.
On the evening of April 19, 1990, Officer Wade Miller of the Alexander City Police Department obtained a search warrant for the residence of Elizabeth Ransaw, located at 913 "J" Street in Alexander City. A number of officers from various law enforcement agencies participated in the execution of that warrant, which occurred around 10:00 p.m. that night. The officers split into two groups upon reaching the residence, with one group covering the front door and a smaller group covering the back door. Alabama Alchoholic Beverage Control Board Agent Darrell Armour was at the front door along with Investigator Ken McGhee of the Tallapoosa County Sheriffs Department and three deputy sheriffs. Officer Miller, Investigator Mike Robinson, and Sergeant Barry Smith were at the back door.
At the suppression hearing, Agent Armour testified that he knocked on the door of the residence, rang the doorbell, and "announced 'police' several times." After one of the deputies with him saw a movement in the window, Agent Armour kicked the door in. Armour stated that "[i]t was probably twenty or thirty seconds, if not longer," between the time he first announced "police" until he kicked open the door. Investigator McGhee's testimony at the suppression hearing paralleled Agent Armour's except that he estimated that "it would have been a couple of minutes after we started knocking and announcing before we entered the residence."
Investigator Robinson testified at the suppression hearing that he could hear the officers at the front door knocking on the door, ringing the doorbell and announcing either "police" or "sheriffs department" very loudly. "After a matter of approximately ten or fifteen seconds, [he] heard the door kicked in." When asked by the trial judge whether the occupants of the house had "time to get to the door and open it," Robinson stated, "Yes, sir. But with all the knocking on the door and then the announcing of our presence, there was time for somebody to get to the door and open it, yes, sir."
The officers testified that lights were on in various rooms in the house when they arrived. They also acknowledged that they did not hear any noises, such as people running or speaking or toilets flushing, from within the house prior to kicking the door open.
Elizabeth Ransaw testified at the suppression hearing that her doorbell rang around 10:00 p.m. on the night in question. Ms. Ransaw stated that she was in bed watching television and that before she *Page 784 
could get from her room to the door, the doorbell rang again. She called out that she was on her way and when she reached the door she asked, "Who is it?" Although she repeated the question twice, no one ever answered. Ms. Ransaw looked out the window and saw that police officers were at the door. She then stepped to open the door. At that point the door was kicked in, knocking her down, and causing some stereo speakers to fall on her, injuring her to the extent that medical attention was required. Photographs showing the damage to Ms. Ransaw's home were admitted.
The trial court denied the appellant's motion to suppress, concluding that "the search warrant was properly executed." In reaching this conclusion, the judge specifically found that the testimony of Elizabeth Ransaw was not credible:
 "The credible evidence to me is that the arrival was announced, the intention of executing the search warrant was adequately announced. It was announced loudly. There was ample opportunity to open the door. There were — Ms. Elizabeth Ransaw earnestly contends that there was something improper about the way the thing was going in, that she wound up with a speaker falling on her. I carefully studied the photos that were admitted, and the only reasonable construction of the evidence that was presented by Ms. Ransaw is that she, in fact, moved speakers in front of the door apparently in an attempt to block — that she obviously attempted to block the door by putting speakers in front of them. There is no other reasonable explanation. There's no way that the speakers could have fallen on her other than the fact that she was behind the speakers and that she put the speakers in front of the door so that they were pushed over on her. If she had time to go to the window and look out the window, she would have had time to open the door. Her contention that she didn't hear the loud announcement, which was obviously made several times, is unreasonable and incredible evidence. She — I simply do not believe the testimony in that regard."
R. 128-30.
It is well settled that the "weight and credibility to be attached to the testimony of witnesses at a suppression hearing is a question for the trial judge." Kitchens v. State,445 So.2d 1000, 1002 (Ala.Cr.App. 1984). Accord, Hoskins v. State,449 So.2d 1269, 1270 (Ala.Cr.App. 1984). Further, a trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, see Bradley v.State, 494 So.2d 750, 760-61 (Ala.Cr.App. 1985), affirmed,494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923,107 S.Ct. 1385, 94 L.Ed.2d 699 (1987), and is not to be reversed absent a clear abuse of discretion, see Harper v. State, 535 So.2d 599,600-01 (Ala.Cr.App. 1988); Herriman v. State, 504 So.2d 353, 359
(Ala.Cr.App. 1987).
Section 15-5-9, Ala. Code 1975, provides:
 "To execute a search warrant, an officer may break open any door or window of a house, any part of a house, or anything therein if after notice of his authority and purpose he is refused admittance."
The officers' testimony at the suppression hearing clearly supports a finding that they adhered to the requirement of the statute that they give notice of their "authority and purpose." Their testimony also supports a finding that they were "refused admittance."
A refusal of admittance need not be express and "will oftentimes be present only by implication." Laffitte v. State,370 So.2d 1108, 1110 (Ala.Cr.App.), cert. denied,370 So.2d 1111 (Ala. 1979) (quoting McClure v. United States, 332 F.2d 19,22 (9th Cir. 1964), cert. denied, 380 U.S. 945, 85 S.Ct. 1027,13 L.Ed.2d 963 (1965)). "[I]f the occupants of the dwelling fail to respond within a reasonable time, refusal can be presumed." Irwin v. State, 415 So.2d 1181, 1183 (Ala.Cr.App.), cert. denied, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283
(1982). "What constitutes a 'reasonable time' is necessarily dependent on the particular facts and circumstances of each individual *Page 785 
case." Id. This time is "necessarily shortened" where illegal drugs are involved due to the great liklihood of the "easy and swift destruction of the evidence." Harper v. State,535 So.2d 599, 600 (Ala.Cr.App. 1988) (quoting Irwin v. State,415 So.2d at 1184).
Contrary to the appellant's assertions, this case is readily distinguishable from McReynolds v. State, 568 So.2d 850
(Ala.Cr.App. 1989), wherein this Court held that the officers had failed to comply with § 15-5-9 because they simultaneously
announced themselves and kicked the defendant's motel room door in. 568 So.2d at 851. The McReynolds officers "simply did not wait for a failure to respond." Id. at 852. Here, the officers waited anywhere from "ten or fifteen seconds" to a "couple of minutes" after announcing themselves before kicking the door in. Furthermore, the officers observed someone moving or looking out from behind a window curtain. Although this is not the equivalent of "running inside the house," Harper v.State, 535 So.2d at 600 (wait of 30 to 45 seconds sufficient where officers heard "running inside the house") or "scurry[ing]," Conner v. State, 382 So.2d 601, 602-03
(Ala.Cr.App. 1979), cert. denied, 382 So.2d 605 (Ala. 1980) (wait of five seconds sufficient where officer heard "a 'scurry in the house' "), we agree with the trial court that it does indicate that the occupants of the house had sufficient time to answer the door. Cf. Irwin v. State, 415 So.2d at 1184 (wait of 20 seconds sufficient even though officers heard no noises from within the house).
As the appellant points out, one of the purposes of the "knock and announce" statute is to prevent "violence or physical injury to the police and to innocent persons who may also be on the premises." Daniels v. State, 391 So.2d 1021,1023 (Ala. 1980). While it is certainly regrettable that Ms. Ransaw was injured during the officers' forced entry, there is evidence that shortly before this search was conducted, she had sold drugs to one Ricky Edwards (see Part III below), and it can hardly be said that she was an "innocent" party. Moreover, the trial court found that Ms. Ransaw was injured due to her own actions in attempting to prevent the officers' entry.
Under the circumstances presented by this case, there was no error in the trial court's denial of the motion to suppress.
 II
The appellant also asserts that the cocaine was inadmissible because there was a break in the chain of custody.
During the search of Ms. Ransaw's house, Officer Wade Miller found twelve small plastic bags, each of which contained one piece of what appeared to be crack cocaine. Officer Miller immediately gave these bags to Investigator Ken McGhee, the evidence technician. Investigator McGhee entered the bags in his log and kept them in his care and possession until May 8, 1990, when he and Officer Miller took the bags to the Alabama Bureau of Investigation ("ABI") lab in Montgomery for fingerprint analysis.[1] Carol Curlee, an ABI fingerprint expert, removed the pieces of cocaine from the plastic bags and placed each piece in a separate envelope. She then gave the envelopes to Investigator McGhee.
Investigator McGhee kept the envelopes, identified at trial as State's Exhibit 9, in his possession and control until May 10, 1990, when he gave them to Officer Miller, who took them to the forensic sciences lab in Auburn. Officer Miller gave the envelopes to lab employee William Morran, who in turn gave them to drug analyst Sherwin Boswell. Boswell performed an analysis of the contents of each of the twelve envelopes and determined that each piece was crack cocaine. He then gave the cocaine, along with his paperwork, to his supervisor, Taylor Noggle, for verification. After checking Boswell's results, Noggle returned the cocaine to Boswell, who kept it until it was picked up by Investigator McGhee on June 9, 1990.
Every person who handled this cocaine testified except Taylor Noggle. The appellant maintains that the chain of custody *Page 786 
was not adequately established for the admission of the cocaine because Noggle did not testify. However, Boswell testified that Noggle frequently checks his work as a quality control measure and that this procedure entails only a check of his paperwork and does not involve any additional testing of the substance itself. Moreover, Boswell stated that Noggle checked the paperwork in his presence and that the cocaine was never out of his sight.
Where, as in this case, "each witness who does testify accounts for the integrity of the evidence and there is no contention that the evidence was contaminated or altered in any way, there is no error in the admission of the evidence even though one link in the chain does not testify." Snowden v.State, 574 So.2d 960, 964 (Ala.Cr.App. 1990), quoted in Lamar v.State, 578 So.2d 1382, 1387 (Ala.Cr.App. 1991). " 'The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.' " Ex parte Williams,548 So.2d 518, 520 (Ala. 1989) (quoting Ex parte Williams, 505 So.2d 1254,1255 (Ala. 1987)). That fact was clearly established in this case.
 III
The appellant contends that the evidence was insufficient to support his conviction for possession of cocaine.
Twelve bags of crack cocaine were found under the liner of a trash can located in the front bedroom of the residence at 913 "J" Street. Agent Darrell Armour testified that when he entered this bedroom, the appellant, clad only in his underwear, was "lying there in bed talking on the telephone." According to Armour, the trash can was beside the bed and was "within arms length" of the appellant. Officer Wade Miller testified that the closet in this bedroom contained men's clothing, including a suit in a cleaner's bag to which was attached a ticket bearing the appellant's name. Also in this bedroom was "paper work" bearing the appellant's name. Investigator Ken McGhee testified that, prior to this incident, he had seen the appellant's "vehicles or at least one of his vehicles there on and off at that residence for months." He estimated that the appellant's vehicle was at Ms. Ransaw's residence "three or four nights a week."
The officers testified that Ms. Ransaw and her brother, Ulysses Jennings, were both present in the house at the time of the search. There were two other bedrooms in the house and, apparently, Ms. Ransaw occupied one and Mr. Jennings occupied the other. However, the only illegal drugs found during the search of both the house and the vehicles parked outside were the twelve bags of crack cocaine found in the trash can in the room occupied by the appellant.
Robert Russell testified that he was working as an informant for the police in this case. Around 9:00 a.m. on the day of the search, he saw the appellant, whom he had known for a long time, "[i]n front of [the appellant's] house." Russell identified the appellant's house as "the same residence as Elizabeth Ransaw's residence." At that time, Russell talked with the appellant about purchasing some cocaine. The appellant told Russell that "he had it," but that "Elizabeth was holding it." Russell told the appellant that he would "come back later."
Around 4:00 or 5:00 that afternoon, Russell saw the appellant again at Big B Barbecue, Russell's place of employment. The appellant stated that "he was holding it" and he told Russell to "come back later on that night." Shortly before the officers executed the search warrant, Russell and one Ricky Edwards went to the residence at 913 "J" Street, where Edwards bought drugs from Ms. Ransaw. The appellant was present at this transaction and Russell saw him "show" Edwards "some drugs." Although Russell was "wearing a wire" during this visit, the tape recording generated thereby appears to have been unintelligible due to technical problems.
The appellant's defense was that he had been out of town for several days before the search, while Ms. Ransaw and Mr. Jennings remained at the residence, and that he was unaware of the presence of the *Page 787 
cocaine in the room he was occupying. He argues that the State failed to prove either that he had constructive possession of the cocaine or that he had knowledge of its presence in the room.
It is clear that the State was relying on constructive possession in this case. When illegal drugs are "found on premises owned or controlled by the accused," it may be inferred that the accused is in constructive possession of those drugs. Donahoo v. State, 505 So.2d 1067, 1070
(Ala.Cr.App. 1986) (emphasis in original). Although the appellant did not own the house at 913 "J" Street, it is undisputed that he resided at that house at least some of the time,[2] and that he was at that residence at the time the cocaine was found. The fact that an accused is present in a place where illegal drugs are found will not, alone, establish the accused's constructive possession of those drugs. See Radke v.State, 52 Ala. App. 397, 398, 293 So.2d 312, 313, affirmed,292 Ala. 290, 293 So.2d 314 (1974). However, " '[p]roximity to illegal drugs [and] presence on the property where they are located' . . . may be sufficient to support a finding of possession when accompanied 'with testimony connecting the [accused] with the incriminating surrounding circumstances.'United States v. Ratcliffe, 550 F.2d 431, 434 (9th Cir. 1976)."Beggs v. State, 568 So.2d 377, 380 (Ala.Cr.App. 1990).
In this case, the appellant was not "merely" present at the residence at 913 "J" Street. He was the only person in the room where the cocaine was found, see Soriano v. State,527 So.2d 1367, 1372 (Ala.Cr.App. 1988); the only illegal drugs found during the search were found in the room occupied by the appellant; the appellant was lying on the bed, clad in only his underwear, and was talking on the telephone; and clothing which was identified as the appellant's and "paper work" bearing his name were found in the room, see McGruder v. State,560 So.2d 1137, 1139 (Ala.Cr.App. 1989). This evidence was sufficient to create a jury question of whether the appellant had constructive possession of the cocaine found in the trash can. See McGruder v. State, 560 So.2d at 1139; Mitchell v. State,395 So.2d 124, 126 (Ala.Cr.App. 1980), cert. denied,395 So.2d 127 (Ala. 1981).
Where the State seeks a conviction based on an accused's alleged constructive possession of illegal drugs, it must establish that the accused had knowledge of the presence of those drugs. Boswell v. State, 570 So.2d 818, 819
(Ala.Cr.App. 1990); Chislom v. State, 565 So.2d 1189, 1191
(Ala.Cr.App. 1990). If the accused is in exclusive possession of the premises where the illegal drugs are found, it may be inferred that he had knowledge of the presence of the drugs. Exparte Wells, 527 So.2d 762, 763-64 (Ala. 1988). However, where, as in this case, the accused is not in exclusive possession of the premises where the drugs are found, "a jury may not infer that he knew of the presence of [those drugs] without some other circumstances to support such an inference." Id. at 764. "[T]he kinds of circumstances which may provide a connection between a defendant and [illegal drugs] are unlimited and will naturally depend on the facts of each particular case." Templev. State, 366 So.2d 740, 743 (Ala.Cr.App. 1978).
In this case, the cocaine was found in a trash can near the bed on which the appellant was lying. Just as mere proximity to illegal drugs will not, alone, establish constructive possession of the drugs, it will not, alone, establish knowledge of the presence of the drugs. See Perry v. State,534 So.2d 1126, 1128 (Ala.Cr.App. 1988). However, the appellant's proximity to the cocaine was coupled with the testimony of the informant, Russell, who stated that earlier that day the appellant had indicated that he (the appellant) had cocaine to sell and that just prior to the execution of the search warrant he (Russell) had observed the appellant "show[ing]" some drugs to *Page 788 
Ricky Edwards. Reviewing the State's evidence under the principles set forth at length in Dolvin v. State,391 So.2d 133, 137-38 (Ala. 1980), White v. State, 546 So.2d 1014, 1016-18
(Ala.Cr.App. 1989), and Cumbo v. State, 368 So.2d 871, 874-76
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), we find that it was more than sufficient to support the appellant's conviction.
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] No identifiable fingerprints were found on any of the bags.
[2] The appellant himself testified that he lived with Ms. Ransaw off and on and that he was doing so in April 1990.