The appellant, Saketo Laquano Witcher, appeals his July 10, 1992, conviction for unlawful possession of a controlled substance (cocaine) and his sentence of three years' imprisonment, split into two years' imprisonment and one year's probation. Prior to his trial, the appellant moved to suppress evidence of the cocaine that was removed from an apartment he was found in during a search by officials with the Montgomery Operation on Drugs Task Force (hereinafter "MOD"). The motion to suppress was denied on July 9, 1992, after a hearing. The appellant raises two issues for our review.
 I
The appellant first contends that the trial court erred in denying his motion to suppress the cocaine seized pursuant to a search warrant. Specifically, he argues that there was insufficient information in the affidavit to support the magistrate's finding that there was probable cause for the issuance of the warrant. The relevant part of the affidavit submitted by Montgomery County Sheriffs Deputy Stephen McKitt states:
 "Probable cause being that on or about February 1992, 'A' acting as an agent of this affiant and under the supervision and control of this affiant went to the above stated location believed to be 3157 Fair West Place in the Westwood Apartment Complex, Montgomery, Alabama, and 'A' purchased a quantity of crack cocaine from a black male known as Jamie Flowers. 'A' also observed a larger quantity of crack cocaine on Jamie Flowers'[s] person or being kept, stored, sold and concealed within the residence and in the apartment across the hall, which is supposed to be vacant at this time, by Jamie Flowers.
 "Further probable cause being that, on a second occasion during February 1992, 'A' acting as an agent of this affiant and under the supervision and control of this affiant again went to noted location believed to be 3157 Fair West Place in the Westwood Apartment Complex, Montgomery, Alabama, and purchased a quantity of crack cocaine from a black male known as Jamie Flowers. 'A' also observed a quantity of cocaine being kept, stored, sold, and concealed within the residence and in the apartment across the hall, which is supposed to be vacant at this time, by Jamie Flowers.
 "Further probable cause being that 'A' has observed a quantity of cocaine at this location within the past 72 hours.
 "Further probable cause being that 'A' has given information in the past that have [sic] been known by or verified by this agent.
 "The foregoing is based on information obtained through this confidential informant and personal knowledge of this agent and on facts obtained by the agent of the Montgomery District Attorney's Office, Fifteenth Judicial Circuit, Montgomery, Alabama, and is made for the purpose of securing an anytime search warrant for the residence whose location is detailed above and further referenced by diagram. The target apartment is located on the north end of building # 4 in the upstairs unit: Westwood Apartment Complex whose address is believed to be 3157 Fair West Place, Montgomery, Alabama, for cocaine and any other controlled substance: to include drug paraphernalia, records of drug transactions, drug buy money and weapons; also to include persons, outbuildings, and vehicles located within the curtilage thereof."
Deputy McKitt was assigned to MOD and acted as the case agent for this case. He testified at the hearing on the appellant's motion to suppress that he was assisted during the investigation by two separate confidential informants. Each informant made separate drug buys at the residence described in the affidavit. *Page 73 
The first informant, described as "A" in the affidavit, had worked for McKitt for approximately six months. The informant was attempting to work off a possible drug charge that could be brought against him. This particular informant had proven to be helpful and reliable in the past by assisting McKitt in obtaining other search warrants. On this particular occasion, the informant approached McKitt and informed him that drugs could be bought at the address described in the affidavit. Based on this information, McKitt set up the first controlled drug buy, which took place approximately one to two weeks before the date the warrant was issued. McKitt was unclear during the hearing as to the exact date of that first buy.
McKitt provided the informant with the money to make the drug buy. He also searched the informant to make sure that he was not concealing drugs or other money on his person. At that time, the informant left to go to the apartment that he had described. McKitt remained approximately 100 yards away from the apartment itself and watched as the informant entered the building. However, since the entrance to the apartment was inside the building, he could not see the informant enter the apartment. When the informant completed the buy, he met McKitt in a designated location and turned over the "crack" cocaine. McKitt then searched the informant a second time to see if he had really used the money McKitt had given him to buy drugs. McKitt could find no money on the informant's person.
The second drug buy set up by McKitt was to take place on February 26, 1992, the same day that he obtained a warrant to search the apartment. The buy was performed by a second informant, also described in the affidavit as "A." This informant was offered to McKitt by Blake Trammer, an officer with the Montgomery Police Department and a fellow member of MOD. Although McKitt had never used this particular informant before, Trammer had worked with her for approximately eight months. Based on her prior information, Trammer was able to obtain search warrants that led to felony arrests and to the seizure of cash and vehicles. Her information had always proven accurate in the past. Unlike the first informant, the second informant was not trying to work off a possible drug charge. Instead, she was usually paid for the information she provided. However, Trammer did not pay her for her help in this case, nor could he remember if McKitt ever paid her.
The second drug buy was conducted in much the same way as the first. McKitt provided the second informant with money and she went to the apartment described in the affidavit and purchased drugs. Again, McKitt remained in the area and monitored the building. He also examined the apartment after the buy to help verify its exact location for his affidavit and the map that he attached to the affidavit. On that same day, McKitt completed his search warrant affidavit, which included all of the above-described information. The magistrate issued a search warrant based on the information that was contained in the affidavit.
In addressing the appellant's argument that the magistrate's finding of probable cause was in error because the information contained in the affidavit was insufficient to support that finding, we find the following principles to be pertinent:
 "Probable cause must be determined by an analysis of 'the totality of the circumstances.' Illinois v. Gates, 462 U.S. 213, 238
[103 S.Ct. 2317, 76 L.Ed.2d 527] (1983). In determining whether to issue a search warrant, the issuing magistrate is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of the person supplying the information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Illinois v. Gates; Hyde v. State, 534 So.2d 1132 (Ala.Cr.App. 1988). Our duty as a reviewing court is to ensure that the magistrate had a substantial basis for concluding that probable cause existed. Illinois v. Gates; McCray v. State, 501 So.2d 532 (Ala.Cr.App. 1986); Hyde v. State. Probable cause may be based on hearsay from a reliable source if there is a disclosed, reliable basis for the information. *Page 74 Illinois v. Gates, 462 U.S. at 245
[103 S.Ct. at 2335]. . . ."
Marks v. State, 575 So.2d 611, 614-15 (Ala.Cr.App. 1990).
In this particular case, Deputy McKitt's information came from two experienced informants, one of whom had given him accurate and helpful information in the past, which allowed him to obtain search warrants in other cases. The other informant had worked for McKitt's partner, Blake Trammer, and McKitt knew that they had worked together "several times." Thus, contrary to the appellant's assertion, the informants were shown to have been credible sources of information in the past. Even absent such a showing, "An informant need not have a 'track record' before his veracity can be established." Pugh v. State,493 So.2d 388, 391 (Ala.Cr.App. 1985), affirmed, 493 So.2d 393
(Ala. 1986). McKitt carefully monitored both drug buys by observing the informants as they entered and exited the apartment building. He also searched the informants before and after the buys to ensure that they had no drugs or money on their persons. In short, there was very little chance that the informants could have falsified their findings under such controlled conditions. Therefore, the information contained in the affidavit established sufficient probable cause to support the issuance of the search warrant.
 II
The appellant also contends that the trial court erred in not granting his motion to suppress because, he says, the agents who executed the search warrant failed to comply with the "knock and announce" statute, § 15-5-9, Code of Alabama 1975. That section provides:
 "To execute a search warrant, an officer may break open any door or window of a house, any part of a house, or anything therein if after notice of his authority and purpose he is refused admittance."
On the afternoon of February 26, 1992, Deputy McKitt, Officer Trammer, and other MOD agents participated in the execution of the search warrant. They drove to the apartment building in a van and another car and parked near a side entrance. The agents exited their vehicles and proceeded directly to the second floor of the building where the apartment described in the warrant was located. Upon reaching the apartment, the agents attempted to gain entrance into the apartment. Testimony received during the suppression hearing and at trial varied as to how this attempt was made.
During cross-examination, McKitt gave the following testimony:
 "Q When you went up to the door to serve the search warrant did you knock on the door? How did you get in the apartment?
"A Kicked the door in.
"Q You didn't knock on the door first?
 "A I can't recall. It [kind of] happened fast; I can't recall exactly.
 "Q Okay. So you just go up there and in your best memory you kicked the door in?
 "A I wouldn't say I didn't knock, but I'm not going to swear that I did."
When the state conducted a redirect examination of McKitt, he stated:
 "Q Do you normally knock when you do a search warrant with Montgomery Operation on Drugs?
"A Yes, ma'am.
 "Q And you weren't the only person at the door on this occasion?
"A No, ma'am."
When questioned further about the incident on re-cross-examination, McKitt testified as follows:
 "Q Okay. So you went to the door first, is that correct?
"A I can't recall; I really don't know.
 "Q Did someone in the apartment come and open the door and let you in?
"A No, sir.
"Q You had to kick the door down; is that correct?
"A Yes, sir.
 "Q You don't remember whether you knocked first or not?
"A No, sir, I cannot remember. *Page 75 
 "Q Did you hear anything from inside the apartment, noise, talking, or anything when you got there?
"A None that I can remember."
Officer Blake Trammer was called as the state's next witness at the hearing. When he was questioned about he procedure used to gain entrance into the apartment he testified as follows:
 "Q Can you tell us basically the procedure from the time you got out of the car until the time you entered the residence what happened?
 "A From the time we left the car we went up to the door, we knocked. At that time we heard shuffling. At that time we kicked the door in.
"Q You heard what?
 "A Shuffling like someone was moving. We kicked the door in. As we entered into the residence the defendant, Jarvis Watkins, was sitting right at the door in a chair to the left hand side of the door. The other defendant, Saketo Witcher, was sitting over near the wall by the window on a sofa.
On cross-examination, Trammer stated:
 "Q Who had the search warrant in their possession when you went up to the apartment?
"A I assume Agent McKitt. He was the case agent.
"Q Did he go first? Was he in front of you?
"A Yes, sir, he was up in front of me.
"Q Did he go up to the door first?
 "A I would say that he went to the door before I went to the door, but I can't necessarily say whether he was the first one to the door or not.
"Q Did you say that someone knocked on the door?
"A Yes, sir.
"Q Who was it?
"A Agent King.
"Q Agent King?
"A (Witness nods head up and down.)
"Q How many times did he knock on the door?
 "A Roughly I would say one to two; I can't say for sure.
"Q Then he kicked the door in?
"A Yes, sir.
 "Q How long was it after he knocked before he kicked the door in?
"A Some seconds; I can't say exactly.
"Q Was it almost immediately?
"A No, sir; I would say about fifteen seconds.
"Q No one came to the door?
"A No, sir, no one came to the door.
 "Q You said that you heard something inside when you knocked on the door?
"A Yes, sir.
"Q And describe again what you heard.
 "A Basically footsteps moving through the residence.
 "Q Which could have been someone coming to the door; is that correct?
"A It's possible, yes, sir."
Finally, the appellant was questioned at trial about what took place prior to the agents' kicking open the door to the apartment. On cross-examination, the appellant testified as follows:
"Q You said you heard some running up the stairs?
"A Yes.
"Q Who did you think it was? Did you know?
 "A I heard when they hollered 'Narcotics.' We just remained calm.
 "Q You heard them running up the stairs yelling 'Narcotics?'
 "A No; we heard them when they was outside first. I was sitting by the window, Mark was sitting right here (indicating) and Jarvis was sitting over here (indicating).
". . . .
"Q Could you see out the window?
"A Yes.
"Q So you saw them coming?
 "A No, I just heard them when they said 'Narcotics' and we just remained calm.
"Q Can you see out the window to the stairs? *Page 76 
"A You can if you look.
"Q But you weren't looking?
"A No, ma'am.
 "Q You just heard people yell 'Narcotics,' but you weren't looking?
"A No, ma'am.
 "Q You heard them go into the apartment next door (the vacant apartment described in the affidavit as the place where drugs had been stored)?
"A Yes, ma'am.
"Q How did you know they went in there?
 "A We heard this here (indicating), and see the apartments over there are real damaged up bad. I just heard this (indicating) over next door and then they just kicked. They did not knock period.
 "Q So you know they went in the apartment next door because you heard it?
 "A I just know I heard it. You can hear it next door like that (indicating)."
In analyzing the differing accounts of what happened when the agents tried to enter the apartment, we are mindful that "a trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion." Jackson v.State, 589 So.2d 781, 784 (Ala.Cr.App. 1991). Although agent McKitt recalled little else other than the door being kicked in, we believe that the trial court did not abuse its discretion when it chose to dismiss his testimony and accept instead the testimony of agent Trammer. According to Trammer, one of the agents named King knocked "one to two" times on the door and then waited "about fifteen seconds" before kicking the door open. During that fifteen second time period, Trammer said that he heard "footsteps moving through the residence." When Trammer's account is coupled with the appellant's trial testimony that he first heard the agents running up the stairs and then heard them "holler[ing] 'Narcotics,' " there is clear support for a finding that the agents complied with the requirement of § 15-5-9 that notice be given of their "authority and purpose." We also find that the testimony supports a finding that the agents were "refused admittance," thus, justifying their forceful entrance into the apartment.
 "A refusal of admittance need not be expressed and 'will oftentimes be present only by implication.' Laffitte v. State, 370 So.2d 1108, 1110 (Ala.Cr.App.), cert. denied, 370 So.2d 1111
(Ala. 1979) (quoting McClure v. United States, 332 F.2d 19, 22 (9th Cir. 1964), cert. denied, 380 U.S. 945, 85 S.Ct. 1027, 13 L.Ed.2d 963 (1965)). '[I]f the occupants of the dwelling fail to respond within a reasonable time, refusal can be presumed.' Irwin v. State, 415 So.2d 1181, 1183 (Ala.Cr.App.), cert. denied, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). 'What constitutes a "reasonable time" is necessarily dependent on the particular facts and circumstances of each individual case.' Id. This time is 'necessarily shortened' where illegal drugs are involved due to the great likelihood of the 'easy and swift destruction of the evidence.' Harper v. State, 535 So.2d 599, 600
(Ala.Cr.App. 1988) (quoting Irwin v. State, 415 So.2d at 1184)."
Jackson v. State, 589 So.2d 781, 784-85 (Ala.Cr.App. 1991).
In this particular case, the search warrant obtained by the agents called for the seizure of the drugs, drug paraphernalia, and weapons contained in two separate apartments. In addition, agent Trammer testified that, after agent King knocked on the door, he heard "footsteps moving through the residence," and after approximately fifteen seconds King kicked the door open.
We have held in a similar case that a five-second waiting period was sufficient to establish an implied refusal of admittance where an officer executing a search warrant for narcotics heard "a 'scurry in the house.' " Conner v. State,382 So.2d 601, 603 (Ala.Cr.App. 1979), cert. denied,382 So.2d 605 (Ala. 1980). We have also held that a 20-second waiting period was sufficient even though the officers executing the search warrant heard no noise from within the house. Irwin v.State, 415 So.2d 1181, 1184 (Ala.Cr.App.), cert. denied,459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). We see no reason, therefore, why the agents here were not justified in forcefully entering the apartment *Page 77 
after a fifteen-second period in light of what they heard going on inside the apartment. Under the narrow facts presented by this case, we find no error in the trial court's denial of the appellant's motion to suppress.
Accordingly, the judgment of the circuit court is hereby affirmed.
AFFIRMED.
All Judges concur.