WINDOM, Judge.
Roderick Byrd appeals his four capital-murder convictions and sentences of death. Byrd was convicted of three counts of capital murder for taking the lives of Kim Olney, John Aylesworth, and Dorothy Smith during the course of a robbery. § 13A-5-40(a)(2), Ala.Code 1975. He was also convicted of an additional count of capital murder because two or more people were murdered by one act or pursuant to one scheme or course of conduct. § 13A-5-40(a)(10), Ala.Code 1975. After the penalty phase of Byrd’s trial, the jury recommended, by a vote of 11 to 1, that he be sentenced to death for counts one, two, and four. As to count three, the jury’s vote was 10 to 2 for death. The circuit court then ordered and received a presen-tence report. After holding a sentencing hearing, the circuit court accepted the jury’s recommendations and sentenced Byrd to death on all four counts.
At trial, the State’s evidence tended to show the following. On November 24, 2005, Thanksgiving Day, Brandon Mitchell went to Byrd’s sister, Hellena Byrd’s apartment in Birmingham, Alabama, where Roderick Byrd and Jonathan Floyd also lived. Mitchell woke Byrd and enlisted Byrd’s and Floyd’s aid in his plan to commit a robbery at the Airport Inn (hereinafter “the Inn”). After agreeing to help Mitchell commit the robbery, Byrd returned to his bedroom and put on a black shirt, black pants, and black shoes. Shortly thereafter, Floyd drove Mitchell and Byrd to the Inn in Floyd’s automobile.
According to Byrd’s statement, while they were in the parking lot of the Inn, Mitchell, Floyd, and Byrd discussed the robbery. At some point before entering the Inn, Byrd put on a pair of black gloves to prevent leaving physical evidence of his participation in the crime; however, neither he nor Mitchell, who had previously been employed at the Inn, made any attempt to conceal their facial identities.[1] Thereafter, Mitchell and Byrd entered the Inn — each armed with one pistol — and encountered Kim Olney, the desk clerk, and John Aylesworth, a truck driver, who was waiting in the lobby for a ride to Texas.
Once in the Inn, Mitchell focused his attention on Olney while Byrd used his pistol to subdue Aylesworth, a former Marine. At some point during the robbery, Dorothy Smith, a traveler from New York who was in Alabama visiting family for *449 Thanksgiving, entered the lobby of the Inn to rent a room for the night. After she entered the lobby, Smith, like Olney and Aylesworth, was held at gunpoint. During this time, Mitchell took approximately $300 from a cash drawer that was located behind the clerk’s desk and also tried unsuccessfully to open a safe. Mitchell and Byrd also took various items from the three victims, including a tote bag, a duffel bag, clothes, and money. During these events, Olney, Aylesworth, and Smith were each shot behind the ear at close range with .38 caliber pistols.[2] Olney was also shot in the arm. All three victims died as result of a gunshot wound to the head. Forensic testing of the projectiles recovered from the crime scene and the victims’ bodies established that Olney and Smith were shot with the same .38 caliber pistol and that Aylesworth was shot with a different .38 caliber pistol.
After the robbery, Mitchell and Byrd left the Inn on foot. They traveled around to the back of the Inn and climbed a fence that separated the Inn from a neighborhood. Clifford Davis and James Jackson, who lived in one of the houses behind the Inn, saw two men, carrying various items, climb the fence and enter the neighborhood. Although Davis and Jackson could not make a positive identification, they testified that one of the two men they saw climb the fence was wearing all black, including black shoes. Davis and Jackson testified that after the two men climbed the fence and entered the neighborhood, they went in different directions.
Shortly after Mitchell and Byrd separated, Mitchell telephoned Floyd and asked Floyd to come pick him up. Floyd found Mitchell near First Avenue in Birmingham and drove Mitchell to Fifth Avenue South. Floyd dropped Mitchell off on Fifth Avenue and then drove around looking for Byrd. After unsuccessfully searching for Byrd, Floyd returned to Hellena Byrd’s apartment where he found Byrd crying and shaking. At that point, Byrd made a statement to Floyd indicating that Mitchell shot all three people at the Inn.
Floyd and Byrd remained at the apartment for approximately 30 minutes. Then they, along with Hellena Byrd and Byrd’s girlfriend, Lasundra Mosley, went to Byrd’s grandmother’s house, where they ate Thanksgiving dinner.
At some point after Thanksgiving, Byrd went to Georgia where he was apprehended. While in Georgia at the Henry County jail, Byrd gave a statement to two Birmingham police officers in which he confessed to participating in the robbery, but denied any involvement in the murders.
I.
Byrd first argues that “the trial court erred by denying [his] motion to remove the death penalty from consideration -” (Byrd’s Brief at 30.) Specifically, Byrd contends that he is mentally retarded; therefore, his sentence of death constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution as interpreted in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
In Atkins, the United States Supreme Court held that the execution of mentally retarded capital offenders violates the Eighth Amendment’s prohibition of cruel and unusual punishment. Id. at 321. The Court, however, declined to establish a national standard for determining whether a capital offender is mentally retarded and, instead, left to the states “the task of *450 developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.” Id. at 317.
The Alabama Legislature has not yet established a method for determining whether a capital defendant is mentally retarded and, thus, ineligible for a sentence of death. “However, the Alabama Supreme Court, in Ex parte Perkins, 851 So.2d 453 (Ala.2002), adopted the most liberal definition of mental retardation as defined by those states that have legislation barring the execution of a mentally retarded individual.” Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009]-So.3d-, - (Ala.Crim.App.2009) (opinion on return to fourth remand); see also Smith v. State, [Ms. 1060427, May 25, 2007] So.3d-,-(Ala.2007) (“Until the legislature defines mental retardation for purposes of applying Atkins, this Court is obligated to continue to operate under the criteria set forth in Ex parte Perkins.”). Pursuant to Ex parte Perkins, “to be considered mentally retarded, [a capital defendant] must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior.” Ex parte Perkins, 851 So.2d at 456; see also Atkins, 536 U.S. at 321 n. 5. Further, “these [two deficits] must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).” Ex parte Perkins, 851 So.2d at 456; Brownlee v. Haley, 306 F.3d 1043, 1073 (11th Cir. 2002) (recognizing that mental retardation generally requires a showing of an IQ of 70 or below, significant limitations in adaptive skills, and the manifestation of these two deficits during the developmental years). “Therefore, in order for an offender to be considered mentally retarded in the Atkins context, the offender must currently exhibit subaverage intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18.” Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d at-; see also Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009] — So.3d at-(opinion on return to fourth remand) (same); cf. Ex parte Perkins, 851 So.2d at 456 (holding that Perkins was not mentally retarded because, among other reasons, Perkins’s full-score adult IQ was 76); Roper v. Simmons, 543 U.S. 551, 578-79, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (focusing on defendants’ culpability “when their crimes were committed”).
“In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded.” Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d at -; see Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009] — So.3d at-. “ ‘The question of [whether a capital defendant is mentally retarded] is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony of that issue.’ ” Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009] — So.3d at-(quoting Atkins v. Commonwealth, 266 Va. 73, 581 S.E.2d 514, 515 (2003)). As the Alabama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, “which [have] the opportunity to personally observe the witnesses and assess their credibility.” Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d at-(quoting Smith v. State, [Ms. CR-97-1258, Sept. 29, 2006] — So.3d-, -(Ala.Crim.App.2006) (Shaw, J., dissenting) (opinion on return to third remand)).
This court reviews the circuit court’s findings of fact for an abuse of discretion. Snowden v. State, 968 So.2d 1004, 1012 (Ala.Crim.App.2006). “ ‘ “A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his *451 decision.” ’ ” Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005) (quoting State v. Jude, 686 So.2d 528, 580 (Ala.Crim.App.1996) (quoting Dowdy v. Gilbert Eng’g Co., 372 So.2d 11, 12 (Ala.1979) (quoting Premium Service Corp. v. Sperry & Hutchinson, Co., 511 F.2d 225 (9th Cir. 1975)))).
Applying these principles, we conclude that the circuit court correctly determined that Byrd is not mentally retarded and, thus, eligible for a sentence of death. The circuit court conducted a hearing on Byrd’s motion to remove death as a possible sentence due to mental retardation (hereinafter “Atkins motion” or “Atkins hearing”). (R. 45-79.) During the Atkins hearing, Byrd presented the testimony of Dr. Kimberly Ackerson, a clinical psychologist with a specialty in forensic psychology. He also admitted into evidence his school records. Dr. Ackerson testified that she reviewed Byrd’s school records, which included, among other things, a confidential psychological evaluation, a behavioral assessment, and an intellectual assessment. Id. Dr. Ackerson also testified that Byrd was given two IQ tests while he was in school. When he was in the seventh grade, Byrd was administered the Wechsler Intelligence Scale for Children, and his score indicated that his full-scale IQ was 65. (R. 50.) Dr. Ackerson appears to testify that she believed that a 95 percent “confidence interval” regarding Byrd’s seventh-grade IQ score indicates that Byrd’s IQ “would fall somewhere between 59 and 71.”[3] (R. 51.) Thereafter, in the 11th grade when he was 17 years old, Byrd was administered the Wechsler Intelligence Scale for Adults, and his score indicated that his full-scale IQ was 75. (R. 52-54.) According to Dr. Ackerson, “they referred to a 95 percent confidence interval” and that Byrd’s “true IQ is felt to fall anywhere between 71 and 80.” (R. 53.)
In preparation for Byrd’s Atkins hearing, Dr. Ackerson assessed Byrd’s IQ using the Wechsler Adult Intelligence Scale, Third Edition. Based on Byrd’s performance on that test, Dr. Ackerson testified that his full-scale IQ is 72 and that based on a 95 percent confidence interval, his “true IQ [is] between 68 and 77.” (R. 55.) Dr. Ackerson also testified that due to the circumstances at the time the test was administered — Byrd was tired and was in jail awaiting a capital-murder trial — she did not believe that he was able to provide his “best effort” or “to perform optimally” during the IQ examination. (R. 65-66.)
After considering the evidence presented during the Atkins hearing, the circuit court found that Byrd is not mentally retarded and denied his motion. (C.R. 29.) The circuit court grounded its findings “upon the last two tests that were conducted [indicating that Byrd’s IQ was] 72 and 75” and on the fact that Dr. Ackerson did not testify that Byrd is, in fact, mentally retarded. (R. 79; C.R. 29.) The circuit court’s findings are supported by the record.
Based on Dr. Ackerson’s evaluation just prior to trial that placed Byrd’s IQ at 72, Byrd cannot establish the first requirement under Ex parte Perkins, namely that he “currently exhibits] subaverage intellectual functioning....” Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d at -. During oral argument before this court, Byrd argued that although Dr. Ack-erson’s testing showed that he had an IQ score of 72, she also testified that based on a “95 percent” confidence interval, Byrd’s *452 “true IQ [is] between 68 and 77.” (R. 55.) Byrd then urged this court to presume that his true IQ falls at the low end of the confidence interval — between 68 and 70— and to find that he meets the first requirement under Ex parte Perkins.
There are two fatal flaws in Byrd’s argument. First, Byrd bears the burden of establishing by a preponderance of the evidence that he meets the Alabama Supreme Court’s criteria for mental retardation. Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d at-. By relying on the mere possibility that his true IQ falls at the low end of the confidence interval or, as he described it, the “margin of error,” Byrd has not met his burden to establish that it is more likely than not that his IQ is 70 or below. Second, based on Dr. Ackerson’s testimony that Byrd did not perform optimally on the test she administered (R. 65-66), it is possible that his true IQ is above rather than below 72. In any event, this court rejects Byrd’s request that we presume that a capital defendant’s IQ falls at the bottom range of the confidence interval or “margin of error” (Byrd’s Brief at 30-38), and we hold that Byrd did not establish that he currently exhibits subaverage intellectual functioning.
Additionally, after reviewing Byrd’s two juvenile IQ scores, their confidence intervals, Byrd’s school records, and Dr. Acker-son’s testimony, we hold that Byrd failed to meet his burden to prove by a preponderance of the evidence that “subaverage intellectual functioning manifested itself during the developmental period (i.e., before the defendant reached age 18).” Ex parte Perkins, 851 So.2d at 456. The only evidence Byrd presented during the Atkins hearing that related to his IQ during his developmental years were two IQ scores he received during school evaluations. (R. 50-55; C.R. 365-83.) In the seventh grade, Byrd scored a full-scale IQ of 65, with a confidence interval indicating that Byrd’s actual IQ “would fall somewhere between 59 and 71.” (R. 50-54.) Then, when he was 17, Byrd received a full-scale IQ score of 75, with a confidence interval indicating that his actual IQ would fall somewhere “between 71 and 80.”[4] (R. 53; C.R. 365-83.)
Based, in part, on Byrd’s full-scale IQ score of 75 at age 17, the circuit court found that Byrd had not met his burden to establish that he is mentally retarded. (R. 75.) Cf. Jackson v. State, 589 So.2d 781, 784 (Ala.Crim.App.1991) (citing Bradley v. State, 494 So.2d 750, 760-61 (Ala.Cr.App.1985) (“[A] trial court’s ruling based upon conflicting evidence ... is binding on this Court....”)). With nothing more than two conflicting juvenile IQ scores, one of which has a confidence interval that indicated that Byrd’s true IQ would fall between 71 and 80, the circuit court correctly determined that Byrd failed to meet his burden to establish that he is mentally retarded, i.e., that “subaverage intellectual functioning manifested itself during the developmental period.... ” Ex parte Perkins, 851 So.2d at 456. Consequently, Byrd has not established that the circuit court abused its discretion by denying his Atkins motion.
For the foregoing reasons, this court holds that Byrd has not established the first and third requirements under Ex parte Perkins; therefore, the circuit court properly determined that Byrd is not mentally retarded. Consequently, Byrd’s execution does not offend the Eighth Amendment. See Atkins, 536 U.S. 304.
*453 ii.
Byrd next argues that the circuit court erroneously allowed the State to introduce into evidence a statement he gave to law-enforcement officers. Specifically, Byrd argues that due to his mental deficiencies (i.e., his alleged mental retardation and/or his low IQ), he was incapable of knowingly waiving his Miranda[5] rights. Byrd bases his argument on his school records and Dr. Ackerson’s testimony that his low IQ could have affected his ability to understand his Miranda rights. The State asserts that Byrd’s argument is without merit because Byrd is not mentally retarded and because the totality of the circumstances establishes that his waiver of his Miranda rights was knowing and voluntary.[6] We agree.
“It has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate.” Waldrop v. State, 859 So.2d 1188, 1155 (Ala.Crim.App.2000) (citing Jackson v. State, 562 So.2d 1873, 1380 (Ala.Crim.App.1990)). “The trial court’s finding that a statement was voluntary need only be supported by a preponderance of the evidence.” Ex parte Jackson, 836 So.2d 979, 982 (Ala.2002) (citing Dixon v. State, 588 So.2d 903 (Ala.1991)). “ ‘Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accused — i.e., the totality of the circumstances.’ ” Waldrop, 859 So.2d at 1156 (quoting Click v. State, 695 So.2d 209 (Ala.Crim.App.1996)); see also Ex parte Matthews, 601 So.2d 52, 54 (Ala.1992) (holding that a court must analyze the voluntariness of a confession by examining the totality of the circumstances).
A defendant’s low IQ is only one factor that must be considered when reviewing the totality of the circumstances. See Dohyne v. State, 672 So.2d 1319, 1337 (Ala.Crim.App.1994); Beckworth v. State, 946 So.2d 490, 517 (Ala.Crim.App.2005). “While an accused’s intelligence and literacy are important factors, ... weak intellect or illiteracy alone will not render a confession inadmissible.” Hobbs v. State, 401 So.2d 276, 282 (Ala.Crim.App.1981); see also Hodges v. State, 926 So.2d 1060, 1073 (Ala.Crim.App.2005) (same); cf Colorado v. Connelly, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that mental defects alone are insufficient to establish that a confession was involuntary under the Due Process Clause). As this court stated in Beckworth: “[A] defendant’s low IQ does not preclude a finding that a Miranda waiver was voluntary unless the defendant is so mentally impaired that he did not understand his Miranda rights.” 946 So.2d at 517 (citing Dobyne, 672 So.2d at 1337); see Moore v. Dugger, 856 F.2d 129, 132 (11th Cir.1988) (mental deficiencies, in the absence of police coer *454 cion, are not sufficient to establish involuntariness, and the fact that the defendant was generally calm and responsive during interrogation, that he did not appear confused, and that he understood the questions put to him established a valid waiver of Miranda rights, despite the defendant’s low IQ).
Contrary to Byrd’s assertions, Dr. Ack-erson’s testimony that his low IQ could have affected his ability to understand his rights is insufficient to show that he was “so mentally impaired that he [in fact] did not understand his Miranda, rights.” Beckworth, 946 So.2d at 517 (citing Dobyne, 672 So.2d at 1337). Dr. Ackerson did not testify that Byrd’s low IQ rendered him incapable of understanding his rights; instead, she merely stated that Byrd’s low IQ could have affected his understanding of his rights. Without more, this testimony is insufficient to preclude a finding that Byrd knowingly and voluntarily waived those rights.
Moreover, this court’s review of the record and of Byrd’s statement convinces us that Byrd did, in fact, understand his rights and that he knowingly waived them. Prior to Byrd’s statement, law-enforcement officers identified themselves and clearly informed Byrd of his Miranda rights. (R. 84; C.R. 247.) Detective Cynthia Morrow testified that Byrd, after being read his Miranda rights, stated that he understood his rights and that he voluntarily chose to waive those rights. (R. 84-90.) Detective Morrow further testified that Byrd was not threatened or coerced in any manner. Id.
Detective Morrow’s testimony is corroborated by Byrd’s tape-recorded statement and a waiver-of-rights form that he signed. Prior to any questioning, Byrd clearly and articulately read aloud and then signed the statement on the waiver-of-rights form acknowledging, among other things, that: 1) he had been informed of and understood his rights; 2) he voluntarily chose to speak with law-enforcement officers; and 3) no force, threats, or promises had been used to induce him to waive his rights. (C.R. 247.) During the interview, Byrd was calm, responsive, and did not appear confused. His answers to the questions posed establishes that he understood those questions. The fact that Byrd altered his statement when he was confronted with evidence indicating that he was not being truthful establishes that he was lucid and thinking about his responses. Finally, the fact that Byrd required the officers to take a break and that he eventually invoked his right to remain silent establishes that he understood his Miranda rights and understood that he could invoke those rights at any time. See United States v. Dryde'n, 567 F.Supp.2d 643, 653 (D.Del.2008) (holding that a defendant’s invocation of his rights establishes that he understood those rights).
Based on the foregoing, this court is convinced that Byrd knowingly and voluntarily waived his Miranda, rights and that his mental deficiencies did not invalidate that waiver. Consequently, the circuit court correctly allowed Byrd’s statement to be introduced into evidence.
III.
In his brief on appeal, Byrd implies that law-enforcement officers violated his Fifth Amendment right to remain silent when, after he stated “I don’t want to answer no more questions right now” (State’s exhibit 41-B), the officers continued to question him. At the suppression hearing, Byrd argued that all statements he made after he allegedly invoked his right to remain silent should have been suppressed.[7] We disagree.
*455 It is well settled that suspects have a right pursuant to the Fifth Amendment of the United States Constitution to refuse to answer questions posed by law-enforcement officials. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). “Included in the right to remain silent is a right to cut off questioning.” Gamble v. State, 791 So.2d 409, 427-28 (Ala.Crim.App.2000) (quoting Slaton v. State, 680 So.2d 879, 886-87 (Ala.Crim.App.1995) (citing Miranda, 384 U.S. at 474)). “When a [suspect] invokes his right to remain silent, that request must be ‘scrupulously honored.’ ” Gamble, 791 So.2d at 427-28 (quoting Slaton, 680 So.2d at 886-87 (quoting Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975))). “When a purported invocation of a Fifth Amendment privilege is ambiguous, [however,] the police may question the accused for the narrow purpose of clarifying the equivocal request.” Ex parte Woods, 789 So.2d 941, 946 (Ala.2001) (quoting Beard v. State, 612 So.2d 1335, 1341 (Ala.Crim.App.1992) (citing Martin v. Wainwright, 770 F.2d 918 (11th Cir.1985); Thompson v. Wainwright, 601 F.2d 768 (5th Cir.1979); Stewart v. State, 562 So.2d 1365 (Ala.Crim.App.1989); and Bush v. State, 523 So.2d 538 (Ala.Crim.App.1988))).
This court’s review of the evidence presented at the suppression hearing and Byrd’s tape-recorded statement convinces us that the circuit court did not abuse its discretion by denying Byrd’s motion to suppress all statements he made after he allegedly asserted his right to remain silent. Byrd’s statement that he did not “want to answer no more questions right now” was ambiguous at best. (State’s exhibit 41-B) (emphasis added); see State v. Ganpat, 732 N.W.2d 232, 239 (Minn.2007) (holding that a suspect’s statement that he did not want to talk right now was ambiguous); State v. Holcomb, 213 Or.App. 168, 159 P.3d 1271, 1279 (2007) (same); People v. Caruso, 34 A.D.3d 860, 863, 822 N.Y.S.2d 825, 828 (2006) (holding that “right now” is a temporal qualifier and does not clearly communicate a desire to cease all questioning). In response to Byrd’s ambiguous statement, officers properly asked him limited questions designed to ascertain whether he wanted to stop questioning altogether or merely wanted to take a break. (State’s Exhibit 41-8; R. 114.) See Ex parte Woods, 789 So.2d at 946. Thereafter, Byrd clarified that he wanted to take a break, and the officers complied with his request.
Because Byrd’s statement that he did not “want to answer no more questions right now” was ambiguous and because the law-enforcement officers narrowly tailored their subsequent questions to clarify his ambiguous statement, Byrd’s Fifth Amendment right to remain silent was not violated. See Ex parte Woods, 789 So.2d at 946. Consequently, the circuit court did not abuse its discretion by denying Byrd’s motion.
IV.
Finally, Byrd argues that Alabama’s capital-sentencing scheme is unconstitutional pursuant to numerous provisions of the United States Constitution because § 13A-5-47(d), Ala.Code 1975 (hereinafter “Alabama’s judicial-override provision”), allows a judge to override a jury’s sentencing-phase recommendation. In response, the State argues that Byrd does not have standing to challenge the constitutionality of Alabama’s judicial-over *456 ride provision because the judge followed the jury’s recommendation that Byrd be sentenced to death. We agree.
 It is well settled that “ ‘[a] party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights....’” Gavin v. State, 891 So.2d 907, 936 (Ala.Crim.App.2003) (quoting J.L.N. v. State, 894 So.2d 738 (Ala.Crim.App.2002) (quoting other cases)). “ ‘ “ ‘[A]s a general rule, if there is no constitutional defect in the application of a statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.’ ” ’ ” Id. In Gavin, this Court reaffirmed the principle that:
“ ‘ “ ‘ “[an] accused has the right to assert the invalidity of the law, regulation, or rule under which he is being prosecuted, but he must show that his rights are adversely affected by the statute or ordinance, and, more particularly, that his rights are thus affected by the particular feature of the statute alleged to be in conflict with the constitution.” ”” ”
891 So.2d at 936 (quoting J.L.N., 894 So.2d at 742 (quoting State v. Wilkerson, 54 Ala. App. 104, 305 So.2d 378, 380 (Ala.Crim.App.1974) (quoting other cases))); see also McCord v. Stephens, 295 Ala. 162, 325 So.2d 155 (1975) (holding that a defendant cannot challenge the constitutionality of a statute when he cannot show that the alleged unconstitutional feature of the statute adversely affected him); Beckworth v. State, 946 So.2d 490 (Ala.Crim.App.2005) (same).
Applying these principles to a similar situation, this court, in Woods v. State, 13 So.3d 1, 39 (Ala.Crim.App.2007), held that the appellant did not have standing to challenge the constitutionality of Alabama’s judicial-override provision because that provision was not applied in his case (i.e., the judge followed the jury’s recommendation of death). Indistinguishably, Alabama’s judicial-override provision was not applied during Byrd’s sentencing. The jury recommended that Byrd be sentenced to death, and the judge followed that recommendation.
Because Alabama’s judicial-override provision was not applied to Byrd, he does not have standing to challenge its constitutionality. Consequently, Byrd is neither entitled to review of, nor entitled to relief on, this alleged constitutional infraction.
V.
Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of Byrd’s convictions and his sentence of death. Byrd was indicted for, and convicted of, four counts of capital murder — three counts of murder during the course of a robbery, see § 13A-5^0(a)(2), Ala.Code 1975, and one count of murder of two or more people pursuant to one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975.
The record does not reflect that Byrd’s sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The circuit court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In making this determination, the circuit court found that the State proved the existence of the following three aggravating circumstances: 1) Byrd committed the capital offense while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a robbery; 2) Byrd intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct; and 3) the capital offenses were especially hei *457 nous, atrocious, or cruel compared to other capital offenses. See § 13A-5-49, Ala. Code 1975. It also found that the defense established the existence of the following two statutory mitigating circumstances: 1) Byrd did not have a significant history of prior criminal activity; and 2) he was only 22 years of age at the time he committed the offenses. See § 13A-5-51, Ala.Code 1975. With regard to nonstatutory mitigating circumstances, the trial court made the following findings:
“The Court also considered any non-statutory mitigating circumstances pursuant to § 13A-5-52, Code of Alabama (1975). The Court recognizes that this includes ‘any aspect of the defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers.’ The Court finds that the following non-statutory mitigating circumstances do apply:
“1. The childhood trauma of witnessing his mother being killed. Although [Byrd’s] testimony did not include information regarding this incident, [Byrd’s] aunt testified that when she arrived at the scene of her sister’s death Roderick Byrd and the other children were at the scene holding each other. Latonja McDonald’s testimony indicated that [Byrd] was eight or nine years old at the time of the incident, and the record reflects that [Byrd] may have been ten years old when his mother was killed. This was clearly a very traumatic incident which would have adversely affected any child. This also caused [Byrd] to be raised by someone other than his natural parents.
“2. Roderick Byrd’s mental condition during his youth and at the time of the offense should also be regarded as a mitigating circumstance. The Court finds [Byrd] had a low IQ as a child, and this made it more difficult for him to learn in school and socialize. He also had an apparent reading disability. [Byrd’s] below average intelligence continued into adulthood, and it could have caused Byrd to be a ‘follower,’ as his sister indicated. Roderick Byrd may not have been a leader throughout his lifetime or even on the date when the murders occurred, but he was certainly capable of making his own decisions. [Byrd’s] IQ is approximately 72. This low IQ and the other testimony presented regarding Roderick Byrd’s mental condition is sufficient to qualify as a mitigating circumstance under § 13A-5-52, Code of Alabama (1975). This is true even though the record reflects that [Byrd] was not in the mental retardation range.”
(C.R. 36); see also (R. 1191-93) (finding, in part, that Byrd’s low IQ is a significant mitigating circumstance). The sentencing order shows that the circuit court properly weighed the aggravating circumstances and the mitigating circumstances and correctly sentenced Byrd to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this court to reweigh the aggravating circumstances and the mitigating circumstances in order to determine whether Byrd’s sentence of death was proper. After independently weighing the aggravating and mitigating circumstances, *458 this Court finds that Byrd’s death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, this Court must now determine whether Byrd’s sentence is excessive or disproportionate when compared to the penalty imposed in similar eases. Byrd was convicted of three counts of murder during a robbery and one count of murder of two or more people. A sentence of death has been imposed for similar crimes throughout this State. See Melson v. State, 775 So.2d 857, 863 (Ala.Crim.App.1999); Washington v. State, 922 So.2d 145 (Ala.Crim.App.2005); Robitaille v. State, 971 So.2d 43, 76 (Ala.Crim.App.2005). Therefore, we find that the sentence was neither excessive nor disproportionate.
Finally, this Court has searched the entire record for any error that may have adversely affected Byrd’s substantial rights, and we have not found any. See Rule 45A, Ala. R.App. P.
Accordingly, we affirm Byrd’s convictions and sentences of death.
AFFIRMED.
WISE, P.J., and WELCH and KELLUM, JJ., concur.

. The video of the crime recorded by a security camera shows that Mitchell had a knit cap or ski mask on his head; however, the cap was not covering his face, and he eventually removed it from his head.

. The security video from the lobby of the Inn shows Mitchell shooting Olney.

. The school report indicates that “the probability is 90% out of 100 that [Byrd's] true IQ score is between 59 and 71.” (C.R. 372.)

. While Byrd’s 11th grade school records indicate that he had “deficits hinder[ing his academic] success,” this court notes that mental retardation was ruled out as a primary cause of his academic impairment. (C.R. 377.)

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. As an initial matter, the State argues that this issue should be reviewed for plain error because Byrd never specifically argued that his waiver was invalid due to his mental deficiencies. See Rule 45A, Ala. R.App. P. During oral argument before this court, Byrd argued that his motion to suppress and Dr. Ackerson’s testimony were sufficient to preserve this issue for appellate review; therefore, the issue should be reviewed for an abuse of discretion. Snowden v. State, 968 So.2d 1004, 1012 (Ala.Crim.App.2006). This court need not address these arguments because, regardless of which standard of review is employed, based on the law and the evidence presented during the suppression hearing, no error resulted from the admission of Byrd’s statement.

. The circuit court suppressed all statements Byrd made after he stated that he no longer wanted to answer questions that day. (R. 189-90.)